**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**RAMACO RESOURCES, LLC,**

       **Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY, and
ACE AMERICAN INSURANCE
COMPANY,**

       **Defendants**

**Civil Action No. 2:19-cv-00703**

**JURY TRIAL REQUESTED**

---

**PLAINTIFF RAMACO RESOURCES, LLC'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

"[A] losing litigant deserves no rematch after a defeat fairly suffered." *Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 107 (1991). Nevertheless, in this lawsuit, Defendants Federal Insurance Company ("Federal") and Ace American Insurance Company ("Ace") (collectively, "Defendants") seek a rematch about an exclusion in Ramaco's all-risk property insurance policy. As relevant here, fewer than seven weeks before Ramaco's loss, a federal court granted summary judgment against Defendants' privy on an exclusion *identical* to the one Defendants have relied upon to deny Ramaco's claim. *See Copper River Seafoods, Inc. v. Chubb Custom Ins. Co.*, No. 3:16-cv-00039, 2018 WL 6220064, at *4–6 (D. Alaska Sept. 19, 2018). Specifically, the court held that the exclusion—known as "the Rust Exclusion"—was ambiguous and had to be construed in the insured's favor. *See id.* Thus, the Rust Exclusion could be applied to exclude coverage only for superficial damage, not structural damage. *See id.*

Chubb Custom, the insurance company in the *Copper River* litigation, was Federal's wholly owned subsidiary when that litigation began. The Defendants here, Ace and Federal, employed everyone who ever handled the *Copper River* claim—both before and after litigation.

The same in-house counsel—employed first by Federal and now by Ace—managed the *Copper River* litigation and manages the instant litigation. And Federal and Chubb Custom, now sister companies, share claims-handling services, underwriting services, training materials, and in-house accounting and legal services. In addition, James Hamilton, an Ace vice president, was the ultimate decisionmaker in *Copper River* and served as Chubb Custom's corporate representative in the litigation before working on Ramaco's claim. Under any sensible test, Defendants are in privity with Chubb Custom with respect to *Copper River*.

Despite receiving an adverse decision on a word-for-word identical Rust Exclusion not even two months prior, Defendants proceeded almost immediately to do exactly what the *Copper River* court told them they could not do—namely, apply the ambiguous Rust Exclusion against their insured to exclude coverage for structural damage. And they continue to do so even today. Even assuming a factual basis supporting corrosion as a sole cause of loss here—which Ramaco hotly disputes—Defendants' reliance on the Rust Exclusion is wrong for at least three reasons.

*First*, Defendants have admitted that a peril not otherwise excluded from Ramaco's all-risk policy—namely, a falling object—caused damage to Ramaco's building and property. By virtue of the coverage clause, this damage is covered no matter what caused the object to fall.

*Second*, Defendants' denial violates the dictates of issue preclusion, a "sound and obvious principle of judicial policy," *Astoria*, 501 U.S. at 107, as old as the law itself. In *Copper River*, Defendants' privy—in litigation Defendants controlled—attempted to apply the Rust Exclusion to deny insurance coverage for structural damage it believed was caused by corrosion. The insured argued that the Rust Exclusion was ambiguous because it could be read in two ways—namely, to exclude coverage only as to superficial damage or to exclude coverage for structural damage as well. The district court agreed, holding that both readings were reasonable and that, as

a result, Chubb Custom was required to apply the narrower construction in its insured's favor (*i.e.*, it could not rely on the Rust Exclusion to deny coverage for structural damage). Defendants are precluded from relitigating that determination. They, like Chubb Custom before them, must apply the Rust Exclusion to exclude coverage only for superficial damage. Because Ramaco's claim involves structural damage, *not* superficial damage, the Rust Exclusion does not affect coverage. The insurance policy Ramaco purchased from Defendants covered the loss all along.

*Third*, even setting aside issue preclusion, the Rust Exclusion is ambiguous as a matter of West Virginia law and must be construed narrowly in Ramaco's favor. The Rust Exclusion eliminates coverage for damage caused by or resulting from "rust, oxidation, corrosion, or discoloration." Discoloration, of course, can never be a structural issue. The remaining three features—rust, oxidation, and corrosion—can be either superficial or structural, depending on severity. The Rust Exclusion can reasonably be read to exclude only superficial damage or to exclude both superficial and structural damage. The better reading, given the inclusion of discoloration, is that the Rust Exclusion is limited to superficial damage. In any event, because two reasonable readings exist, the Rust Exclusion is ambiguous as a matter of law. For that reason, Defendants were required to apply the provision in their insured's favor and adopt the narrower interpretation. Under this analysis as well, the Rust Exclusion was always limited to superficial damage, and Defendants should have covered Ramaco's loss from the beginning.

As such, Ramaco was entitled to coverage irrespective of the resolution of the ongoing factual dispute regarding whether corrosion did, in fact, cause the silo to fail. Because Defendants have advanced no other theory of causation, let alone factual support for such a theory, there is no other exclusionary language that applied to Ramaco's loss. As a result, the insurance policy Ramaco purchased from Defendants covered the loss at issue, and Defendants'

denial of coverage was a breach of the contract. In addition, given the clarity of the applicable

law—particularly the case law precluding Defendants from doing exactly what they did here, not

to mention Defendants' obligations with respect to ambiguous provisions generally—

Defendants' conduct violates the duty of good faith and fair dealing, amounts to bad faith, and

violates the West Virginia Unfair Trade Practices Act ("UTPA"). As such, the Court should

grant summary judgment to Ramaco on Counts I, II, and III of its Amended Complaint, *see* ECF

No. 14, and it should similarly grant summary judgment against Defendants as to their first

through fifteenth affirmative defenses, *see* ECF No. 30.[1] Only damages remain for the jury on

these counts.

## STATEMENT OF UNDUSPUTED MATERIAL FACTS

1.      Ramaco purchased an all-risk insurance policy from Federal with an effective date of

July 1, 2018. *See* Exh. 1; Exh. 2 at No. 19.

2.      As such, Ramaco is entitled to coverage for any "direct physical loss or damage" to a

"building" or "personal property" that is "caused by or resulting from a peril not otherwise

excluded.". *See* Exh. 1 at FIC_008593; Exh. 2 at No. 20; Chapin Dep. (Exh. 3) at 82:22–83:19.

3.      In their affirmative defenses, Defendants list six policy exclusions—the Acts or

Decisions Exclusion, the Business Errors Exclusion, the Inherent Vice/Latent Defect Exclusion,

the Planning, Design, Materials or Maintenance Exclusion, the Wear and Tear Exclusion, and the

Rust Exclusion. *See* ECF No. 30 (second through seventh affirmative defenses).

---

[1] Defendants' ninth affirmative defense states "Ramaco's claims are barred, in whole or in part, to the extent Ramaco seeks payment in excess of any applicable limit of insurance." ECF No. 30. Because Ramaco does not seek payment in excess of the limit on its contract claim, summary judgment should be granted to Ramaco on this affirmative defense. Defendants fifteenth affirmative defense merely reserves the right to assert additional affirmative defenses. *See id.* Because the time for such amendments has long since passed, Ramaco is entitled to summary judgment on that affirmative defense—to the extent it can be so characterized—as well.

4.      The Acts or Decisions Exclusion in Ramaco's policy provides:

This insurance does not apply to loss or damaged caused by or resulting from acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

This Acts Or Decisions exclusion does not apply to ensuing loss or damaged caused by or resulting from a peril not otherwise excluded.

Exh. 1 at FIC_008604.

5.      The Business Errors Exclusion in Ramaco's policy provides:

This insurance does not apply to loss or damage caused by or resulting from errors in the:
- altering;
- calibrating;
- constructing;
- developing;
- distributing;
- installing;
- manufacturing;
- maintaining;
- processing;
- repairing;
- researching; or
- testing,
of part or all of any property.

This Business Errors exclusion does not apply to:
- loss or damage that results to other covered property; or
- ensuing loss or damage caused by or resulting from a peril not otherwise excluded.

Exh. 1 at FIC_008604–05.

6.      The Inherent Vice/Latent Defect Exclusion in Ramaco's policy provides:

This insurance does not apply to loss or damage caused by or resulting from inherent vice or latent defect.

This Inherent Vice/Latent Defect exclusions does not apply to:
- loss or damage caused by or resulting from a **specified peril**; or
- ensuing loss or damage caused by or resulting from a **specified peril** or **water**.

Exh. 1 at FIC_008606.[2]

7.      The Planning, Design, Materials or Maintenance Exclusion in Ramaco's policy provides:

>   This insurance does not apply to loss or damage (including the costs of correcting or making good) caused by or resulting from any faulty, inadequate or defective:
>   - planning, zoning, development, surveying, siting;
>   - design, specifications, plans, workmanship, repair, construction, renovation, remodeling, grading, compaction;
>   - materials used in repair, construction, renovation or remodeling; or
>   - maintenance,
>
>   of part or all of any property on or off the premises shown in the Declarations.
>
>   This Planning, Design, Materials Or Maintenance exclusion does not apply to ensuing loss or damage caused by or resulting from a peril not otherwise excluded.

Exh. 1 at FIC_008607.

8.      The Wear and Tear Exclusion in Ramaco's policy provides:

>   This insurance does not apply to loss or damage caused by or resulting from wear and tear or deterioration.
>
>   This Wear and Tear exclusion does not apply to ensuing loss or damage caused by or resulting from a **specified peril** or **water**.

Exh. 1 at FIC_008608.

9.      The Rust Exclusion in Ramaco's policy provides:

>   This insurance does not apply to loss or damage caused by or resulting from rust, oxidation, corrosion or discoloration.
>
>   This Rust exclusion does not apply to ensuing loss or damage caused by or resulting from a **specified peril**.

Exh. 1 at FIC_008719.

10.     The Mechanical Breakdown (Other Than Abrupt and Accidental) Exclusion in Ramaco's

policy—which appears in a separately purchased endorsement—provides:

---

[2] In Ramaco's policy, defined terms are bolded. Thus, for example, "specified peril" and "water" are specifically defined in the policy. Unbolded terms are undefined.

This insurance does not apply to loss or damage caused by or resulting from mechanical breakdown.

This Mechanical Breakdown (Other Than Abrupt And Accidental) exclusion does not apply to:

A.  abrupt and accidental breakdown of **mechanical or electrical system or apparatus** which causes direct physical loss or damage to all or part of that **mechanical or electrical system or apparatus** provided the direct physical loss or damage becomes manifest at the time of the breakdown that caused it.

Abrupt and accidental breakdown of **mechanical or electrical system or apparatus** does not include

1.  rust, oxidation or corrosion;
2.  faulty, inadequate or defective design, plan, specifications or installation;
3.  failure of **mechanical or electrical system or apparatus** to perform in accordance with plans or specifications; or
4.  freezing caused by or resulting from weather conditions; or

B.  ensuing loss or damage caused by or resulting from a peril not otherwise excluded.

Exh. 1 at FIC_008606.

11.    The defined term "mechanical or electrical system or apparatus" means, among other things, "mechanical or electrical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power." Exh. 1 at FIC_008700.

12.    Ramaco's policy does not contain an exclusion for falling objects or collapse. *See generally* Exh. 1; Nicolaro Dep. (Exh. 4) at 171:16–172:9.

13.    Defendants have no document that defines the otherwise undefined term "ensuing loss or damage" as used in these exclusions. *See* Exh. 5 at No. 53; Blake Dep. (Exh. 6) at 110:7–18.

14.    Likewise, Defendants have no document that defines "cause of loss," "predominant cause of loss," or "efficient cause of loss." Exh. 5 at Nos. 54–56.

15.     On September 19, 2018, in a case styled *Copper River Seafoods, Inc. v. Chubb Custom Ins. Co.*, No. 3:16-cv-00039, 2018 WL 6220064 (D. Alaska), the U.S. District Court for the District of Alaska granted a motion for summary judgment against Chubb Custom concerning the application of the Rust Exclusion. *See* Exh. 7 (a certified copy of the opinion).

16.     The language of the Rust Exclusion at issue in *Copper River* is word-for-word identical to the Rust Exclusion in Ramaco's policy. *Compare* Exh. 7 at 6 ("The Rust Exclusion in total states: 'This insurance does not apply to loss or damage caused by or resulting from rust, oxidation, corrosion, or discoloration.'"), *with* Undisputed Material Fact ("UMF") ¶ 9 ("This insurance does not apply to loss or damage caused by or resulting from rust, oxidation, corrosion or discoloration.").[3]

17.     Specifically, the *Copper River* court held there are "two reasonable interpretations" of the Rust Exclusion's language—one that excludes losses for only superficial damage and one that excludes losses related to both superficial and structural damage. *See* Exh. 7 at 7–15.

18.     Because of that ambiguity, the court held that the Rust Exclusion must be interpreted in the insured's favor to exclude coverage only for superficial damage. *See id.* at 15.

19.     The *Copper River* lawsuit was filed on February 5, 2016. *See* Exh. 8 .

20.     Prior to the lawsuit, the claims-handling personnel who adjusted the *Copper River* claim were employed by Federal. *See* Rule 30(b)(6) Dep. (Exh. 9) at 331:16–23, 336:20–24.

21.     In January 2016, because of a merger between Chubb and Ace, those claims-handling personnel became Ace employees. *See id.* at 337:1–338:8.

---

[3] Although the court did not mention it in its opinion, the Rust Exclusion in each policy also has identical "ensuing loss" language: "This Rust exclusion does not apply to ensuing loss or damage caused by or resulting from a specified peril." UMF ¶ 9; Exh. 36 at 9 (a certified copy of the policy at issue in *Copper River*, which was attached as an exhibit to the cross-motions for summary judgment and which the court referenced in footnote 28).

22.     As such, the individuals who handled the *Copper River* claim and who managed that litigation were only ever employed by Federal or Ace. *See id.* at 338:9–12.

23.     At the time the *Copper River* litigation began, Chubb Custom was Federal's wholly owned subsidiary. *See* Exh. 9 at 339:12–21; Exh. 10.

24.     In October 2017—in the middle of the *Copper River* litigation—a restructuring occurred whereby Chubb Custom stopped being Federal's wholly owned subsidiary. *See* Exh. 9 at 339:12–16.

25.     Since October 2017, Chubb Custom, Federal, and Ace share common ownership "under the Chubb INA Holdings Group." *Id.* at 339:22–340:13.

26.     The same individual who managed the *Copper River* litigation—in-house attorney David Anderson—also manages this litigation. *See* Exh. 3 at 49:25–50:14; Exh. 9 at 332:8–333:7; Hamilton Dep. (Exh. 11) at 16:17–17:7.

27.     Since May 8, 2015, "[c]laims generated by Federal or Chubb Custom would have been handled by the same group of claim individuals." Exh. 9 at 340:21–23.

28.     Since May 8, 2015, the underwriters for Federal and Chubb Custom policies have been employed by the same legal entity—currently Ace. *See id.* at 340:24–341:18.

29.     Federal and Chubb Custom also share in-house legal services, accounting services, and training materials, all provided by Ace. *See id.* at 341:19–343:21.

30.     "[T]he various underwriting groups under the Chubb name"—which includes Federal and Chubb Custom—"are marketed through the same website of chubb.com." *Id.* at 344:14–16.

31.     On November 5, 2018, Ramaco suffered a loss stemming from a failure at Silo 1 at its coal processing plant in Verner, West Virginia. *See* Exh. 4 at 46:8–12; Exh. 12; Gonsalves Dep. (Exh. 13) at 33:17–19, 90:8–10; Tarpey Dep. (Exh. 14) at 76:11–78:1.

9

32.     The hopper inside the silo detached from the silo wall, fell approximately twenty feet, and damaged the base of the silo and the conveyor system. *See* Exh. 4 at 154:12–155:10; Exh. 6 at 124:17–125:8, 126:18–127:1; Magnotta Dep. (Exh. 15) at 128:12–129:2.

33.     The silo and the conveyor system themselves had no corrosion on them. *See* Exh. 13 at 151:23–153:4 ("I'm not aware of any corrosion at the base of the silo. . . . We're not aware of any corrosion on those pieces of equipment [*i.e.*, machinery that operates the belt]."); Exh. 15 at 127:15–128:11 ("I'm not aware of any reports that say the conveyor belt had corrosion. . . . I saw no evidence of corrosion to a concrete silo."); Exh. 6 at 124:17–125:8, 126:18–127:1 (similar); WJE Dep. (Exh. 16) at 187:1–188:11 (same); Exh. 3 at 63:19–64:7 (same).

34.     The physical damage to the concrete silo and conveyor belt were caused by "the hopper collapsing on top of them." Exh. 3 at 63:16–18.

35.     At the time of the loss, Ramaco's all-risk policy was in effect. *See* Exh. 17 at No. 5.

36.     Ramaco timely filed notice of the loss with Defendants, its insurers, on November 6, 2018. *See* Exh. 13 at 255:9–256:1; Exh. 18.

37.     After initially being assigned to an independent adjuster named Dan Thornbury who informed Defendants that Ramaco had suffered a "very large loss" with estimates of $12-15 million per month in business income losses, the claim was reassigned to in-house adjuster Frank Gonsalves, an Ace employee acting, for this claim, on Federal's behalf. *See* Exh. 3 at 60:23–25; Exh. 11 at 25:19; Exh. 13 at 90:11–21, 96:13–22; Exh. 28 at No. 15.

38.     Ace employed everyone who handled Ramaco's claim. *See* Exh. 28 at No. 15.

39.     Mr. Gonsalves also adjusts claims for other entities in the "Chubb Group of Insurance Companies," including Chubb Custom. *See* Exh. 13 at 10:18–12:11.

40.     On November 12, 2018, Mr. Gonsalves sent a reservation-of-rights letter, informing Ramaco that Defendants "reserve[d] all rights under the Policy if [their] investigation reveal[ed] that the property damages were caused by wear and tear and planning, design, materials or maintenance." Exh. 19.

41.     Federal hired Glenn Rentschler of Wiss, Janney, Elstner Associates, Inc. ("WJE"), to assess the cause of Ramaco's loss. *See* Exh. 20 at 1.

42.     WJE visited Ramaco's site on November 14, 2018, November 29, 2018, and December 11, 2018. *See* Exh. 20.

43.     Dr. Glenn Rentschler was present at all of WJE's 2018 site visits. *See* Exh. 21 at 2, 6.

44.     Mr. Gonsalves was present at the first site visit. *See* Exh. 13 at 265:23–266:2.

45.     Robert Warke was present at the third site visit. *See* Exh. 21 at 6.

46.     On November 9, 2019, prior to Dr. Rentschler's first visit, Ramaco—through its agent—informed Defendants that it "plan[ned] to tear down the damaged silo." Exh. 12.

47.     Dr. Rentschler's first site visit—with Mr. Gonsalves present—occurred during the silo's demolition, before the crew had reached the embedded ring (*i.e.*, the point of failure). *See* Exh. 13 at 265:23–266:10; Exh. 16 at 98:2–99:2.

48.     In a report dated January 4, 2019, WJE concluded: "[I]t is our opinion that the collapse of the conical steel hopper in Silo No. 1 was due to corrosion[.]" Exh. 22.

49.     Prior to that date, WJE had not given Ramaco any instructions about how to preserve the silo. *See* Exh. 16 at 204:22–205:12 (agreeing that WJE gave no such instructions prior to May 16, 2019); Exh. 13 at 258:20–259:6.

50.     On January 4, 2019, Mr. Gonsalves communicated internally that:

> The [WJE] report states that corrosion along the rim of the hopper inside the silo caused it (the hopper) to collapse. There is damage to the silo, conveyor belt, and

the hopper itself. Based off this information I don't believe the hopper itself is covered, but ensuing damage to the silo and conveyor belt are covered. I also believe that coverage would be triggered for [business interruption] and [extra expense] as we would cover the damages to the silo and conveyor belt.

Exh. 23.

51.    Michael Nicolaro, Mr. Gonsalves's supervisor, "agree[d] the rust and wear and tear excludes the hopper" and said Mr. Gonsalves's January 4, 2019, message "does a nice job of summing up our coverage here." Exh. 24.

52.    On January 18, 2019, Mr. Gonsalves sent Ramaco a letter denying the claim in its entirety. *See generally* Exh. 20.

53.    The denial letter incorporated WJE's causation assessment. *See id.*

54.    The denial letter mentioned three policy exclusions—the Planning, Design, Materials or Maintenance Exclusion, the Wear and Tear Exclusion, and the Rust Exclusion. *See id.*

55.    Ramaco disputed the denial by letter on February 1, 2019. *See* Exh. 25.

56.    WJE then reviewed Ramaco's February 1 letter and responded: "[O]ur report provides a definitive conclusion that the failure was the result of corrosion. . . . [C]orrosion of elements at the hopper-to-embedded plate connection was the cause of the failure. . . . We stand by the conclusions in our January 4, 2019[,] report that the failure was due to corrosion." Exh. 26.

57.    Ramaco continued to dispute Federal's denial of coverage, including at a meeting between Ramaco and Federal in March 2019, at which WJE and Ramaco's engineers were present. *See* Exh. 27.

58.    Initially, in a draft e-mail to Ramaco, Steven Magnotta said "new information was discussed" at the March 2019 meeting, *see* Exh. 29, but the word "new" was removed from the e-mail eventually sent to Ramaco, *see* Exh. 30.

59.     After that March 2019 meeting, Federal sent to WJE to Ramaco's site for further

inspection and analysis. *See* Exh. 30.

60.     Mr. Warke of WJE returned to Ramaco's site to collect samples from the hopper on May

16, 2019. *See* Exh. 31 at 1.

61.     In a report dated June 19, 2019, based on analysis of the samples Mr. Warke took in May,

WJE concluded that, of the "plausible mechanism[s]" of failure, "corrosion [was] leading by a

wide margin." *Id.* at 3–4.

62.     WJE opined, however, that "a detailed stress analysis would be required to prove beyond

any reasonable doubt that corrosion was a sufficient cause." *Id.* at 3; *see also* Exh. 32.

63.     Accordingly, Defendants commissioned WJE to "conduct a basic non-linear finite

element analysis of the silo for various levels of corrosion-induced thinning of the steel plate and

fillet weld." Exh. 33 at 1; *see also* Exh. 34.

64.     In a report dated August 20, 2019, WJE stated: "In conclusion, it is our opinion, to a

reasonable degree of engineering certainty, that the collapse of the conical steel hopper in Silo

No. 1 was due to corrosion[.]" Exh. 33 at 5.

65.     On August 29, 2019, Mr. Gonsalves sent Ramaco a second denial letter. *See* Exh. 35.

66.     In the second denial letter, Mr. Gonsalves stated: "[B]ased on our investigation into the

facts of the loss, our coverage determination cited in our January 18, 2019[,] letter remains

unchanged." *Id.*

67.     From January 4, 2019—when Defendants first determined the cause of loss—to the

present, Defendants have asserted that corrosion, and nothing else, caused Ramaco's loss. *See*

Exh. 9 at 173:3–24, 175:8–18; Exh. 2 at No. 27 ("Federal's factual determination was that the

cause of loss was corrosion. . . . Responding further, a 'predominant cause' analysis under

applicable law implies a factual finding that more than one peril caused the loss. To the extent this request is intended to imply that there was a factual finding of multiple perils causing the November 5, 2018[,] failure event, it is denied. The above-referenced factual finding was that corrosion was the *sole* cause of the November 5, 2018[,] failure event." (emphasis added)); Exh. 28 at No. 11 ("The suggestion or implication that there was evidence of more than one peril causing the failure event at Ramaco's property is false. . . . Defendants respond that the evidence supported a finding of a single cause of loss, and that cause of loss was corrosion.").[4]

68.     In short, at no time did Defendants "determine[] that there's been any other cause of loss other than corrosion." Exh. 9 at 175:17–18.

69.     Defendants have taken the position that Ramaco's loss was "caused by" corrosion, not that it was "resulting from" corrosion. *See* Exh. 20 at 4 (pointing out that "the applicable coverage forms exclude damage *caused by* rust"); UMF ¶ 67 (citing discovery responses and testimony stating that the loss was *caused by* corrosion, not that it *resulted from* corrosion).

---

[4] *See also* Exh. 13 at 146:24–147:1 ("[T]he sole cause of loss was due to corrosion."); *id.* at 205:8–10 ("Our engineer, they inspected, they found that the sole cause of the damage was due to corrosion."); *id.* at 217:18–21 ("[W]e concluded the loss was solely due to corrosion."); Exh. 4 at 117:17–18 ("It's my understanding that the sole cause of loss in this case is corrosion."); Exh. 3 at 66:16–20 ("But if your question is was it our conclusion that the loss was solely due to corrosion, then the answer to that question is yes."); *id.* at 71:3–9 (similar); *id.* at 104:15–105:3 ("[T]here were no competing causes of losses suggested by [WJE] in this instance. In this instance, . . . the cause of loss was corrosion."); Exh. 15 at 127:1–2 ("[I]t was only one kind of loss, one cause of loss, and that was due to corrosion."); *id.* at 150:1–2 (similar); *id.* at 151:8–9 (similar); *id.* at 152:21–23 ("[I]t was pretty clear based on the [WJE] reports that the single cause of loss was corrosion."); Exh. 6 at 87:13–15 ("The claim was denied because it was determined that rust or corrosion was the single cause of loss."); *id.* at 105:4–8 ("[C]orrosion was the single and sole cause of loss, the only peril involved[.]"); *id.* at 123:11–12 ("The single cause of loss was rust or corrosion."); *id.* at 142:21–24 (same); *id.* at 162:19–163:1 (similar); *id.* at 170:16–21 (similar); *id.* at 171:2–10 ("And there was only one peril involved in this case, and that was the excluded peril of rust or corrosion.").

70.     With respect to Ramaco's claim, corrosion is not an excluded "latent defect." Exh. 9 at 270:1–5.

71.     With respect to Ramaco's claim, corrosion is not an excluded "inherent vice." *Id.* at 270:8–12.

72.     With respect to Ramaco's claim, corrosion is not an excluded "business error." *Id.* at 270:13–16.

73.     With respect to Ramaco's claim, corrosion is not an excluded "act or decision." *Id.* at 270:17–22.

74.     Although corrosion "*tends* to go hand in hand with the *possibility* that improper maintenance was a contributing factor" and "further investigation *may* certainly have revealed that there was a lack of maintenance . . . that contributed to or caused the loss," Defendants did not determine that a lack of maintenance caused Ramaco's loss. *Id.* at 270:23–271:4, 271:21–272:4, 272:22–273:4 (emphases added).

75.     As of August 28, 2020, Defendants believe "there very well may be a maintenance component to why the corrosion occurred," *id.* at 274:21–275:1, and "reserve [their] rights to assert [the Planning, Design, Materials, or Maintenance Exclusion] to the extent *further investigation* determines that there clearly was a maintenance issue that caused or contributed to the corrosion in this case," *id.* at 289:19–290:14 (emphasis added).

76.     Defendants did not determine that a design defect caused Ramaco's loss and are "not denying the claim on design." *See id.* at 279:3–18, 285:11–17.

77.     As such, "none of the investigation that was performed by Chubb or its retained experts ha[s] provided information that definitively shows that this [Planning, Design, Materials, or Maintenance] exclusion applies." *Id.* at 291:20–23; *see also* Exh. 4 at 158:14–18.

78.     With respect to the Wear and Tear Exclusion, Defendants assert that corrosion "fall[s]" within this particular exclusion" because "[c]ertainly corrosion is deterioration and/or *potentially* wear and tear." Exh. 9 at 291:24–292:10 (emphasis added).

79.     In this respect, Defendants assert that corrosion "*could* be wear and tear" and "*may* fall within wear and tear depending on the facts, or it may not." *Id.* at 293:1–20 (emphases added).

80.     Defendants assert only that corrosion "may fall within the meaning of wear of tear," not that it definitively does fall within the term. *Id.* at 293:21–294:5.

81.     Defendants claim corrosion "clearly falls" within "deterioration." *Id.* at 294:1–15.

82.     Defendants cannot identify any instance in which corrosion would not be deterioration. *See id.* at 294:6–15.

83.     One of the individuals involved in handling Ramaco's claim—James Hamilton, Ace's Vice President, Property Claim Director—was Chubb Custom's corporate representative in *Copper River*. *See* Exh. 11 at 7:18–22.

84.     In addition, Mr. Hamilton "was ultimately responsible for making the coverage determination" on the *Copper River* claim." Exh. 28 at No. 14.

85.     Although the Rust Exclusion here is word-for-word identical to the one at issue in *Copper River*, and although Mr. Hamilton personally wrote the check to the insured after the court's decision in that case, Mr. Hamilton made no effort to learn what the court had decided with respect to the Rust Exclusion in that case when assessing coverage as to Ramaco's claim. *See* Exh. 11 at 7:23–8:4, 8:21–10:24, 12:17–14:20, 15:24–16:16, 17:16–18:8, 23:3–24:8.

86.     Indeed, Mr. Hamilton made no effort to apply his experience in *Copper River*, a case he knew involved the interpretation of the Rust Exclusion, to Ramaco's claim at all. *See id.* at 8:21–12:9, 12:17–14:20, 15:24–16:16, 17:16–18:8, 23:3–24:8.

87.    Kurt Chapin, Ace's Chief Technical Officer, is responsible for guiding and training Defendants' claims staff regarding how coverage should be analyzed and ensuring they are updated on relevant legal issues and court cases. Exh. 3 at 7:13–20, 9:8–10:3, 10:25–11:6.

88.    Mr. Chapin, who was consulted on Ramaco's claim, knew about the *Copper River* court's holding but did not share that information with the claims-handling personnel responsible for handling Ramaco's claim. *See id.* at 11:20–22, 14:22–15:7, 42:5–16, 47:7–21.

89.    Discoloration is purely superficial; it cannot be structural. *See* Exh. 13 at 272:21–276:6; Exh. 16 at 192:19–21.

90.    Rust, oxidation, and corrosion can be either superficial or structural, depending on their severity. *See* Exh. 16 at 192:22–193:22.

91.    Mr. Gonsalves did not analyze whether Ramaco's loss was covered as a machinery breakdown. *See* Exh. 13 at 254:16–24; Exh. 3 at 64:25–65:3.

92.    "[T]he conveyor belt system . . . fall[s] within the definition of a mechanical or electrical system or apparatus." Exh. 3 at 126:20–127:1; *see also* Exh. 11 at 99:16–100:16; Exh. 16 at 186:4–187:13.

93.    The claim file does not include any mention of Defendants' analysis of coverage as a machinery breakdown, although Mr. Nicolaro testified such analysis occurred. *See* Exh. 4 at 204:20–207:9.

94.    Defendants do not maintain a list of complaints made against them concerning their claims-handling conduct. *See* Exh. 37 at RFP No. 12; Exh. 38 at 2.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the pleadings and evidence before the court show no genuine dispute of any material fact and that

the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party demonstrates the

absence of a triable issue of material fact, the burden shifts to the non-moving party to present

specific facts showing that there is a genuine issue of material fact for trial. *See* Fed. R. Civ. P.

56(c); *Celotex*, 477 U.S. at 324. The opposing party must provide "more than a scintilla of

evidence—and not merely conclusory allegations or speculation—upon which a jury could

properly find in its favor." *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 500 (4th Cir.

2015) (citations and quotations omitted).

"[T]he mere existence of some alleged factual dispute . . . will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases

added). "Only disputes over facts that might affect the outcome . . . will properly preclude the

entry of summary judgment." *Id.* at 248. "Factual disputes that are irrelevant or unnecessary will

not be counted." *Id.* In addition, a dispute is "genuine" only when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Id.* Finally, "[t]he moving party

is entitled to judgment as a matter of law when the non-moving party fails to make an adequate

showing on an essential element for which it has the burden of proof at trial." *News & Observer*

*Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).

**ARGUMENT**

## I.     THE PORTION OF RAMACO'S LOSS "CAUSED BY" THE FALLING HOPPER WAS COVERED BY VIRTUE OF THE COVERAGE CLAUSE.

Pursuant to the policy, Ramaco is entitled to coverage for any "direct physical loss or

damage" to a "building" or "personal property" that is "caused by or resulting from a peril not

otherwise excluded" from the policy. UMF ¶ 2. Critically, this coverage clause uses the same

causation formulation—"caused by or resulting from"—as all the exclusions Defendants have ever cited to deny coverage. *See* UMF ¶¶ 3–10. These identical (and undefined) phrases, appearing in the same policy, must have the same meaning, and "caused by" and "resulting from" must themselves mean different things (or else one is surplusage). The most natural read is that "caused by" refers to a direct cause (*i.e.*, the link closest to the damage in the chain of causation), while "resulting from" identifies more remote causes up the chain.

Here, Defendants agree that damage to the silo and conveyor system were "caused by" the falling hopper. *See* UMF ¶¶ 32–34. They agree that, based on the generally understood definition "of the word 'peril,' [a] falling object could be a peril if it causes damage." Exh. 4 at 168:19–169:1. And they further agree that falling objects are not excluded by Ramaco's policy. *See* UMF ¶ 12.

By the policy's plain language, the separate items of damage to the silo and conveyor system are covered because they were "caused by . . . a peril not otherwise excluded." UMF ¶¶ 1–2. Having admitted that a non-excluded peril caused the items of damage to the silo and conveyor belt, *see* UMF ¶¶ 32–34, the analysis as to those items is over. The damage caused by the falling object is covered by virtue of the coverage clause, *see* UMF ¶ 2, as is the resulting lost business income and extra expense. As such, Defendants' coverage denials breached the contract, and Ramaco is entitled to summary judgment on Counts I and II and on Defendants' first through twelfth, fourteenth, and fifteenth affirmative defenses.

## II. EVEN NOTWITHSTANDING THE ABOVE, DEFENDANTS' RELIANCE ON EXCLUSIONS BREACHED THE CONTRACT.

Under West Virginia law, Defendants bear the burden of proving of any policy exclusions. *See, e.g.*, *State Auto. Mut. Ins. Co. v. Alpha Eng'g Servs., Inc.*, 542 S.E.2d 876, 879 (W. Va. 2000) ("When an insurance company seeks to avoid . . . its duty to provide coverage,

through the operation of a policy exclusion, the insurance company bears the burden of proving the facts necessary to trigger the operation of that exclusion."); *See Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 8 (W. Va. 1998) ("When . . . the insurance company seeks to avoid liability through the operation of an exclusion, the insurance company has the burden of proving the exclusion applies to the facts of the case."). Indeed, Defendants acknowledged this reality. *See, e.g.*, Exh. 3 at 83:17–19 ("As with any all-risk policy, the burden is on the insurer to determine whether or not an exclusion applies.").

Here, even assuming corrosion caused the hopper to detach from the silo (which Ramaco disputes), Defendants cannot meet their burden for several reasons. *First*, *Copper River* precludes them from relying on the Rust Exclusion to deny coverage for anything but superficial damage. Because Ramaco's loss was structural, it was covered. *Second*, the Rust Exclusion is ambiguous as a matter of West Virginia law and must be construed in Ramaco's favor. Under this analysis as well, the Rust Exclusion concerns only superficial damage, and Ramaco's loss was covered. *Third*, having determined that Ramaco's loss involved the "single peril" of corrosion, Defendants cannot apply any other exclusion to bar coverage. *Fourth*, Mr. Gonsalves's inconsistent view regarding the meaning of "ensuing loss" demonstrates that the term is ambiguous and must also be construed in Ramaco's favor. The correct construction demonstrates that Defendants' investigatory failures deprived Ramaco of multiple avenues to coverage. Defendants' misinterpretations of the policy also create meaningless surplusage.

As such, Ramaco is entitled to summary judgment on Counts I and II of the Complaint and on Defendants' first through twelfth, fourteenth, and fifteenth affirmative defenses.

20

### A.   *Copper River* Precludes Defendants' Effort to Relitigate the Rust Exclusion's Meaning and Application.

"Collateral estoppel or issue preclusion forecloses the relitigation of issues of fact or law that are identical to issues [that] have been actually determined and necessarily decided in prior litigation in which the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate." *Ramsay v. U.S. I.N.S.*, 14 F.3d 206, 210 (4th Cir. 1994) (internal quotation marks and citation omitted). Here, West Virginia's issue preclusion rules apply. *See, e.g.*, *LaRosa v. Pecora*, No. 1:07CV78, 2009 WL 1457739, at *2 (N.D. W. Va. May 21, 2009). West Virginia applies the doctrine of issue preclusion when four elements are present:

> (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*State v. Miller*, 459 S.E.2d 114, 120 (1995). Here, all elements are satisfied, and Defendants are precluded from relitigating whether they can apply the Rust Exclusion to deny claims for structural damage.

### 1.   *Copper River* resolved issues identical to the ones disputed here— whether the Rust Exclusion is ambiguous and whether it applies to structural damage.

In *Copper River*, the U.S. District Court for the District of Alaska examined the exact Rust Exclusion at issue in this case. The two contractual provisions are word-for-word identical. *See* UMF ¶ 16. And there, as here, "[t]he parties' dispute center[ed] on the meaning of the four words in the Rust Exclusion—rust, oxidation, corrosion, or discoloration—and whether the provision applies to only superficial damage as [the insured] contends, or includes structural damage as [the insurer] contends." *Copper River*, 2018 WL 6220064, at *3. In addition, here, as there, the parties disagree about whether the Rust Exclusion is ambiguous. If the Rust Exclusion

applies only to superficial damage, Defendants cannot invoke it to deny Ramaco's claim. If it also applies to structural damage, however, it is at least possible—if Defendants carry their burden to prove that corrosion was the sole cause of loss here—that it could exclude those items of damage caused by corrosion. Thus, the issues presented here are identical to the ones litigated in *Copper River*. Indeed, it is difficult to imagine more closely aligned issues.

### 2. The *Copper River* decision was a "final adjudication on the merits."

*Copper River* resolved both questions identified above, holding that the Rust Exclusion was ambiguous and that it must be applied to exclude only superficial damage, *not* structural damage. *Id.* at *6; UMF ¶¶ 15–18. Thus, it granted summary judgment to the insured on the Rust Exclusion affirmative defense. *See id.* Pursuant to Alaska law, the court analyzed the question by reference to four factors: (1) the provision's language, (2) other policy provisions, (3) extrinsic evidence, and (4) case law about similar provisions. *Copper River*, 2018 WL 6220064, at at *4.

With respect to the first factor, the court held that three of the terms included in the Rust Exclusion—namely, rust, oxidation, and corrosion—could refer either to superficial damage only or "could also include structural damage." *Id.* As to the fourth term, however, the court noted that discoloration "is entirely based on a change of *appearance* of an object and therefore cannot be more than superficial damage." *Id.* The presence of "discoloration" in the Rust Exclusion—as "one of only four listed conditions in the exclusion"—"suggests that the remaining three terms likewise could also reasonably be read to only apply to superficial damage." *Id.*

With respect to the second factor, the court held that Chubb Custom's broader interpretation was inconsistent with another policy provision. *Id.* at *5 ("[Chubb Custom's] broader interpretation of the Rust Exclusion . . . would make the Hidden Decay provision obsolete because there would never be an instance where hidden corrosion or decay would be

present sufficient to trigger the Hidden Decay provision while also escaping the Rust

Exclusion."). The narrower only-superficial-damage-is-excluded interpretation, however,

"preserve[d] the operation of each provision in the policy." *Id.* As discussed below, *see infra* at

Part II.D.3, Defendants' interpretation of the Rust Exclusion is similarly inconsistent with a

provision in Ramaco's policy—namely, the Mechanical Breakdown Exclusion.

For the third and fourth factors, the court explained that "[n]either party . . . introduced

extrinsic evidence" and that "there [were] no other cases with identical or similar language to the

Rust Exclusion." *Id.* at *6. In conclusion, the court held that "there [were] two reasonable

interpretations of an insurance policy," rendering it ambiguous as a matter of law, which in turn

meant the court was required to "construe the policy in favor the insured." *Id.* As such, the court

held that the Rust Exclusion must be limited to exclude only superficial damage. *See id.* Having

done so, it declared "there is no excludable cause still at issue." *Id.* at *8 & n.61.

The *Copper River* decision conclusively resolved Chubb Custom's Rust Exclusion

affirmative defense in its entirety. *See* UMF ¶¶ 15, 17–18. Under West Virginia law, this

decision is "final" and entitled to preclusive effect. *See, e.g.*, *Neiswonger v. Hennessey*, 601

S.E.2d 69, 73 (W. Va. 2004) (holding that a grant of partial summary judgment was a "final

adjudication on the merits" of the issues decided therein). And giving the decision preclusive

effect accords with treatment by courts throughout the Fourth Circuit. *See, e.g.*, *Saudi v. Ship*

*Switzerland, S.A.*, 93 Fed. App'x 516 (4th Cir.2004) (holding that a previous grant of partial

summary judgment that allowed three causes of action to move forward was "clearly . . . a final

decision on the merits"); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. PWG-14-

111, 2015 WL 5201356, at *6 (D. Md. Sept. 4, 2015), *aff'd in part*, 850 F.3d 1332 (Fed. Cir.

2017) (collecting cases and holding that a grant of partial summary judgment was a "final order

for purposes of issue preclusion" because it provided a "comprehensive analysis" of the

questions and "fully resolved the issues" related to a particular claim).

> ### 3.    Defendants were in privity with Chubb Custom, the defendant against whom summary judgment was granted in *Copper River*.

"The concept of privity . . . is difficult to define precisely but the key consideration for its

existence is the sharing of the same legal right by parties allegedly in privity, so as to ensure that

the interests of the party against whom preclusion is asserted have been adequately

represented." *Blake v. Rubenstein*, No. CV 2:08-0906, 2016 WL 5660355, at *10 (S.D. W. Va.

Apr. 5, 2016), *report and recommendation adopted*, 2016 WL 5661233 (S.D. W. Va. Sept. 28,

2016). As the Fourth Circuit has explained:

> There are three generally recognized categories of non-parties who will be considered in privity with a party to the prior action and who will therefore be bound by a prior adjudication: (1) *a non-party who controls the original action;* (2) a successor-in-interest to a prior party; and (3) *a non-party whose interests were adequately represented by a party to the original action.*

*Martin v. Am. Bancorporation Ret. Plan*, 407 F.3d 643, 651 (4th Cir. 2005) (emphases added).

Put somewhat differently:

> To determine whether two parties are in privity, the relevant question is whether it is proper for one to be bound by the prior judgment against the other. Preclusion is fair so long as the relationship between the nonparty and a party was such that the nonparty had the same practical opportunity to control the course of the proceedings that would be available to a party.

*Blake*, 2016 WL 5660355, at *10 (internal quotation marks and citations omitted); *Whitehead v.*

*Viacom*, 233 F. Supp. 2d 715, 721 (D. Md. 2002), *aff'd*, 63 Fed. App'x 175 (4th Cir. 2003)

("Defendant clearly had an interest in the subject matter of the earlier litigation since Defendant

owns Paramount, which was the defendant in the earlier suits.").

Given these standards, parent companies and wholly owned subsidiaries are in privity, as

are sister companies. *See, e.g.*, *Dunlap v. Cottman Tramsmissions Sys., LLC*, 689 Fed. App'x

188, 189 (4th Cir. 2017) (holding that "two companies, both wholly owned subsidiaries of the same company, are in privity with one another" and collecting relevant cases); *Meisner v. Zymogenetics, Inc.*, No. 3:15-CV-3523-CMC, 2016 WL 4858741, at *4 (D.S.C. Sept. 15, 2016), *aff'd*, 697 Fed. App'x 218 (4th Cir. 2017) ("A relationship between a parent and a wholly-owned subsidiary is sufficiently close to justify the application of *res judicata*." (citations omitted)); *Whitehead*, 233 F. Supp. 2d at 721 (same); *Caperton v. A.T. Massey Coal Co.*, 679 S.E.2d 223, 264 (W. Va. 2008), *rev'd and remanded on other grounds* 556 U.S. 868 (2009) ("A.T. Massey Coal Company is in privity with its subsidiary Wellmore, as are the remaining Massey Defendants, who are also subsidiaries of Massey and sister corporations to Wellmore.").

Here, there is no good-faith argument against privity. When the *Copper River* litigation began, Chubb Custom was Federal's wholly owned subsidiary. *See* UMF ¶ 23. During the case, they became sister companies. *See id.* ¶¶ 24–25. Moreover, that litigation was managed by the same individual who manages this litigation. *See id.* ¶ 26. In addition, everyone who handled the claim that resulted in the *Copper River* litigation was employed by Defendants here. *See id.* ¶¶ 19–22. In other words, no one who ever worked on the claim or the litigation was ever actually an employee of Chubb Custom. And one of the individuals involved in adjusting Ramaco's claim—James Hamilton—was "ultimately responsible for making the coverage determination" in *Copper River. Id.* ¶ 84. As summarily stated by Defendants' Rule 30(b)(6) representative, there is "no separation within the claims department," between Defendants and Chubb Custom. Exh. 9 at 349:19–21. Defendants here plainly "control[led] the original action" and had their interests "adequately represented" in a manner sufficient to establish privity. *See Martin*, 407 F.3d at 651; *Blake*, 2016 WL 5660355, at *10. Defendants' interests in *Copper*

*River* are unmistakable and beyond reasonable dispute, particularly since everyone who ever touched the claim or case was employed only by Defendants. *See* UMF ¶¶ 20–22.

If those facts were not enough, Federal and Chubb Custom also share underwriting services, in-house legal services, accounting services, and training materials. *See id.* ¶¶ 28–29. Any claims generated on their polices are handled by the same individuals. *See id.* ¶ 27. Indeed, Mr. Gonsalves, an Ace employee and the adjuster here, regularly handles claims generated on Federal's and Chubb Custom's policies. *See id.* ¶¶ 37, 39. The two entities are largely treated as one, equal members of the Chubb Group of Insurance Companies. There are undoubtedly difficult calls when it comes to privity among companies; this case is not among them.

### 4. Defendants had a full and fair opportunity to litigate the issues decided in *Copper River*.

In West Virginia, "collateral estoppel mandates that the facts, the legal standards, and the procedures be identical and that the party against which the doctrine is asserted has had a full and fair opportunity to litigate the issue." *Abadir v. Dellinger*, 709 S.E.2d 743, 748–49 (W. Va. 2011). "In other words, the central inquiry on collateral estoppel is whether a given issue has been actually litigated by the parties in the earlier suit." *Id.* at 749.

Before the issues were decided in *Copper River*, Chubb Custom—through litigation efforts managed by Defendants, *see* UMF ¶ 26—had a full and fair opportunity to obtain relevant discovery and to present any evidence or argument in support of its position. Indeed, the issues were resolved at summary judgment, more than two years after the case was filed, after both parties had fully participated in the discovery process and submitted a full complement of briefing. *See, e.g.*, *Copper River*, 2018 WL 6220064, at *1 & n.3.

And the relevant legal standards governing that case are identical to the ones here. *Compare id.* at *3 ("An insurance policy is generally construed in such a way as to honor a lay

insured's reasonable expectations. In other words, the objectively reasonable expectations of applicants regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations. Thus, where there are ambiguities in an insurance policy, they are to be construed in favor of the insured. Alaskan courts find that ambiguities only exist when there are two or more reasonable interpretations of particular policy language." (internal quotation marks omitted)), *with Murray*, 509 S.E.2d at 6 ("[W]henever the language of an insurance policy provision is reasonably susceptible of two different meanings . . . , it is ambiguous. It is well settled . . . that ambiguous terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured." (citations omitted)); *id.* at 14 ("[T]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.").

There is no question that the questions were "actually litigated" in *Copper River* and that Chubb Custom, in litigation fully controlled by these Defendants, was given a "full and fair opportunity" to litigate them. It simply lost.

*    *    *

Defendants are precluded from applying the Rust Exclusion in a manner inconsistent with *Copper River*. As such, Ramaco is entitled to summary judgment on Defendants' sixth affirmative defense and to associated declaratory relief (Count I).

### B. Even if Defendants Are Permitted to Relitigate the Rust Exclusion, It Is Ambiguous as a Matter of Law and Must Be Construed in Ramaco's Favor.

A policy's language is ambiguous when it "is reasonably susceptible of two different meanings." *Murray*, 509 S.E.2d at 6. Ambiguous terms "are to be strictly construed . . . in favor of the insured." *Id.* In determining whether a provision in an insurance contract is ambiguous,

27

West Virginia courts consider how other courts have resolved the question. *See, e.g.*, *id.* at 9 & n.6 (finding it relevant that a majority of courts addressing the provision at issue had found it to be ambiguous). In addition, West Virginia courts apply the doctrine of *ejusdem generis*, whereby "the general words [in a contract] will be limited in their meaning or restricted to things of like kind and nature with those specified." *Id.* Likewise, West Virginia courts apply the doctrine of *noscitur a sociis*, whereby a term is "known from its associates" such that a word's meaning "may be known from the meaning of accompanying specific words." *Id.*

Here, and largely for the reasons outlined in *Copper River*, the Rust Exclusion is ambiguous under West Virginia law. In particular, three terms—rust, oxidation, and corrosion—could, in theory, apply to either structural or superficial issues, UMF ¶ 88, while the fourth term—discoloration—is applicable *only* to superficial issues, *id.* ¶ 87. As such, there are two reasonable readings of the provision, a narrower one that excludes coverage only as to superficial damage and a broader one that excludes coverage as to both superficial and structural damage. That *Copper River* analyzed this exact provision and held it was ambiguous, and no court has held otherwise, is highly persuasive and would be considered as such by West Virginia courts. Moreover, when presented with a discovery request that included both "rust" and "corrosion"— as the Rust Exclusion does here, *see* UMF ¶ 9—*Defendants* objected that the request "identifies various synonyms . . . , including without limitation 'rust' and 'corrosion,' which makes the interrogatory unintelligible, vague, and ambiguous." Exh. 28 at No. 11. The Rust Exclusion is likewise "unintelligible, vague, and ambiguous." These ambiguities resolve the matter in Ramaco's favor, as ambiguities in the policy must be strictly construed against Defendants.

The doctrines of *ejusdem generis* and *noscitur a sociis* further support this construction of the Rust Exclusion. Indeed, *Copper River* reached this exact conclusion. *See Copper River*, 2018

WL 6220064, at *4 & n.44 (pointing to *ejusdem generis* as a reason to construe the Rust

Exclusion to apply only to superficial damage). Discoloration, by its very nature, can be

superficial only. Defendants and their investigator admitted as much. *See* UMF ¶ 87. Because

rust, oxidation, and corrosion (*i.e.*, terms that could theoretically apply to superficial or structural

damage) are located alongside discoloration (*i.e.*, a term that can apply only to superficial

damage), the Rust Exclusion is best read to apply only to superficial damage.

Thus, assuming Defendants can relitigate the point, the Rust Exclusion is ambiguous and

excludes coverage only as to superficial damage. Once again, Ramaco is entitled to summary

judgment on Defendants' sixth affirmative defense and to associated declaratory relief (Count I).

### C.   Having Determined that Corrosion Was the "Only Peril" and "Sole Cause" Involved in Ramaco's Loss, Defendants Cannot Rely on Any Other Exclusionary Language in the Policy.

"Under an all-risk policy, recovery is allowed for all losses arising from any fortuitous

cause, unless the policy contains an express provision excluding the loss from coverage." *See*

*Murray*, 509 S.E.2d at 7. For exclusionary language to apply to a loss, "[t]he excluded peril itself

must be the efficient proximate cause of the loss." *Id.* at 15. Here, according to Defendants,

corrosion was the "only peril" and "sole cause" involved in Ramaco's loss. *See* UMF ¶¶ 67–68.

They never determined that *any* other peril caused the silo to fail. *See id.* Nevertheless,

Defendants have advanced affirmative defenses based on perils they never determined had any

role in Ramaco's loss. *See, e.g.*, ECF No. 30 (Defendants' second, third, fourth, fifth, seventh,

eighth, eleventh, and twelfth affirmative defenses).[5] But because, even according to Defendants,

---

[5] Defendants seventh and eighth affirmative defenses do not mention the specific perils they
believe caused the loss and instead claim "Ramaco has failed to show, and cannot carry its
burden of demonstrating, that any direct physical loss or damage it has alleged . . . w[as] caused
by or resulted from a peril not otherwise excluded." ECF No. 30. These affirmative defenses
plainly misstate the applicable burdens in this case. *See, e.g.*, *State Auto.*, 542 S.E.2d at 879;

those perils *did not cause* Ramaco's loss, these exclusions are inapplicable, and Ramaco is entitled to summary judgment on these affirmative defenses. *See Murray*, 509 S.E.2d at 7.

Defendants have further admitted that, for this claim, corrosion—the only peril they ever determined caused the loss, *see* UMF ¶¶ 67–68—is not an excluded "latent defect," "inherent vice," "business error," or "act or decision." *Id.* ¶¶ 70–73. Moreover, prior to this litigation, Defendants never included these exclusions as bases for their denial of coverage. *See id.* ¶¶ 40, 54. These are additional reasons to grant Ramaco summary judgment on Defendants' second and third affirmative defenses. Defendants' admission that "none of the investigation that was performed by Chubb or its retained experts ha[s] provided information that definitively shows that this [Planning, Design, Materials, or Maintenance] exclusion applies," UMF ¶ 77, is similarly fatal to their fourth affirmative defense. The notion that Defendants may reserve a right to "further investigation," *id.* ¶¶ 74–75, regarding that exclusion now—nearly two years after the loss, a year into litigation, after the close of discovery, and as we approach trial—is absurd.

To the extent Defendants continue to maintain any exclusion other that the Rust Exclusion, it is the Wear and Tear Exclusion. But, there, they claim corrosion is excluded "deterioration," *id.* ¶¶ 78, 81, and "potentially wear and tear," *id.* ¶¶ 78–80. This argument suffers at least three fatal flaws. *First*, the Wear and Tear Exclusion is hopelessly ambiguous as to corrosion—a term it nowhere mentions. Defendants effectively admit as much when they say corrosion "could" or "may" "potentially" amount to "wear and tear" under the policy. *Id.* ¶¶ 78–80. *Second*, the exclusion is equally ambiguous as to "deterioration"—another undefined term.

---

*Murray*, 509 S.E.2d at 8. Because Ramaco bears no such burden—and, instead, Defendants bear a burden to prove the applicability of exclusions to coverage—summary judgment is appropriate on these affirmative defenses. And, in any event, Defendants' admit that Ramaco suffered a direct physical loss in this case. *See* Exh. 3 at 83:12–13 ("We agree that there is direct physical loss or damage in this case.").

*See id.* ¶ 8 & n.2 (not bolding the term). Either conclusion about corrosion amounting to "deterioration"—yes or no—is reasonable. *Third*, if Defendants are correct that corrosion "certainly falls" within the deterioration portion of the Wear and Tear Exclusion, *id.* ¶ 81, it necessarily results in meaningless surplusage in the Rust Exclusion. Because corrosion would *always* amount to deterioration, *id.* ¶ 82, and thus be excluded under the Wear and Tear Exclusion, the specific mention of "corrosion" in the Rust Exclusion, *id.* ¶ 9, would achieve nothing. This reality renders a conclusion that deterioration *does not* include corrosion the far more reasonable reading, as only it synthesizes the two exclusions.

Because Ramaco's policy was an all-risk policy, *id.* ¶¶ 1–2, Defendants' conclusion that the "only peril" and "sole cause" involved in Ramaco's loss, *id.* ¶¶ 67–68, necessarily means that, unless the Rust Exclusion applies to exclude coverage for Ramaco's claim, the loss was a covered event. *See Murray*, 509 S.E.2d at 7. And, because the Rust Exclusion does not apply to Ramaco's loss, *supra* at Parts II.A & II.B, Ramaco has established coverage. Because the loss was covered, Defendants' denial of coverage was a breach of contract, and Ramaco is entitled to summary judgment on Counts I and II of its Amended Complaint and on Defendants' first through twelfth, fourteenth, and fifteenth affirmative defenses.[6]

---

[6] Defendants' tenth affirmative defense relates to Ramaco's unspecified failures "to comply with the provisions of the Federal Policy entitled: Compliance By Insured, Inspection and Surveys, and/or Insured's Duties in The Event of Loss or Damage." ECF No. 30. As discussed in Ramaco's separately filed motion for sanctions, despite promising to supplement an interrogatory regarding the factual basis for this affirmative defense, *see* ECF Nos. 148 & 149, Defendants never did so. As such, this affirmative defense is a particularly strong candidate for being struck as a sanction for Defendants' repeated and flagrant discovery misconduct. That said, Ramaco is unaware of any conduct that implicates the identified policy provisions. The closest Defendants ever came to claiming Ramaco failed to comply with its duties is pointing out that Ramaco did not preserve the entire hopper for inspection. This conduct, however, cannot amount to a failure to cooperate because Defendants and their investigator did not provide instructions on how to preserve the hopper prior to its demolition, *see* UMF ¶ 49, despite being both informed that demolition would soon occur, *see id.* ¶ 46, and present at a time before demolition reached

**D.      Defendants' Misinterpretations of the Policy Deprived Ramaco of Coverage and Rendered Additional Provisions Meaningless Surplusage.**

For insurance policies—as with all contracts—West Virginia courts "construe all parts of the document together." *Payne v. Weston*, 466 S.E.2d 161, 166 (W. Va. 1995). But Defendants' interpretations render the "ensuing loss" clauses of exclusions—including the Planning, Design, Materials, or Maintenance Exclusion cited in their denial letter, *see* UMF ¶¶ 7, 54—as well as the Mechanical Breakdown Exclusion, meaningless surplusage. This Court should instead read these provisions together, giving full effect to all of them. *See Payne*, 466 S.E.2d at 166. In addition, Mr. Gonsalves's evolving view of the meaning of "ensuing loss" confirms the term is ambiguous and must be "strictly construed" in Ramaco's favor. *See Murray*, 509 S.E.2d at 6.

**1.      Mr. Gonsalves's varying interpretations of "ensuing loss" demonstrate that the clauses are ambiguous, and Defendants' interpretation also renders them surplusage.**

As relevant here, although they agree that the damage to the concrete silo and the conveyor belt was caused by the falling hopper, and *not* by corrosion, *see* UMF ¶¶ 32–34, Defendants have testified that this damage is not an "ensuing loss" under the policy. *See* Exh. 3 at 61:10–62:16. "Ensuing loss," they argue, must be loss or damage that "occurs from a new and independent peril distinct from the peril that may be excluded." *Id.* at 57:20–58:6. As an initial matter, "ensuing loss" is not defined anywhere in Ramaco's policy, *see* UMF ¶¶ 4–10, 13 & n.2, and Defendants do not have *any* written definition of the term, *see id.* ¶ 13. And Mr. Gonsalves, the adjuster on Ramaco's claim, initially took a different view of the term's meaning. *See id.* ¶ 50

---

the embedded ring, *see id.* ¶ 47. As a matter of law, Ramaco's conduct cannot amount to a failure to cooperate with Defendants' investigation. In addition, to the extent Ramaco's purported failure to comply with nonexistent instructions to preserve evidence deprived Defendants of additional evidence that corrosion caused the loss, it is completely irrelevant. *See supra* Parts I, II.A, II.B.

(suggesting that the damage to the silo and conveyer belt were covered as "ensuing damage");
Exh. 13 at 147:5–19 (admitting that his view at the deposition was different than what he thought
on January 4, 2019, when he first analyzed coverage).

These facts alone demonstrate that the repeated use of the undefined term "ensuing loss"
is, at best, ambiguous. Mr. Gonsalves, Defendants' employee tasked with analyzing coverage
under Ramaco's policy, had inconsistent views of its meaning over time. His supervisor believed
his first approach was "nice" work. *See* UMF ¶ 51. Defendants cannot seriously contend that one
of Mr. Gonsalves's two views was "unreasonable" as a matter of law. *See, e.g.*, *Murray*, 509
S.E.2d at 6. As such, the "ensuing loss" clauses must be "strictly construed" in Ramaco's favor,
*see id.*, to except covered perils from the exclusions even if they are caused by excluded perils.
Indeed, this reading is consistent with existing West Virginia case law on the topic. *See, e.g.*,
*Erie Ins. Prop. & Cas. Co. v. Chaber*, 801 S.E.2d 207, 214–15 (W. Va. 2017) (holding that "an
ensuing loss provision . . . provide[s] coverage" when an excluded peril causes a covered peril).
The Supreme Court of Appeals of West Virginia has explained:

> Some insurance policies contain "ensuing loss provisions[]" that provide coverage
> for certain covered perils which would otherwise be covered even when that
> covered peril was caused by an excluded peril. In other words, an ensuing loss
> provision provides coverage for specific types of losses that are otherwise covered
> in the policy when that loss is the result of the occurrence of an excluded peril. For
> example, a policy may provide that it does not cover any loss caused by earth
> movement; however, any ensuing loss by fire which is not excluded or excepted is
> covered. This means the policy covers loss caused by fire that would not have
> occurred but for the earth movement; however, other damage caused by the earth
> movement is not covered.

*Id.* at 214–15 (quoting 11 Couch on Insurance § 153:70 (3d ed. 2014)).

Defendants' interpretation of the "ensuing loss" clauses also renders them surplusage. If
the "ensuing loss" clause is triggered only by a "new and independent peril," Exh. 3 at 57:20–
58:6, and that "independent" peril is either a "specified peril," UMF ¶¶ 6, 8–9, or a "peril not

33

otherwise excluded" from the policy, *id.* ¶¶ 4–5, 7, the "ensuing loss" clause does no work at all. The "new and independent peril" provides coverage in that event because it is "not otherwise excluded" from the all-risk policy (*i.e.*, by virtue of the coverage clause), *not* as an exception to an exclusion. In short, unless the "ensuing loss" clauses mean damage is covered when an excluded peril causes a covered peril, which then causes the damage, they mean nothing; coverage either exists because a covered peril independently caused the loss, or it does not exist at all. In addition, if Defendants' interpretation of the "ensuing loss" provisions were correct, there would be no need for the anti-concurrent causation clauses in Ramaco's policy. *See, e.g.*, Exh. 1 at FIC_008609 ("This insurance does not apply to loss or damage caused by or resulting from earthquake; regardless of any other cause or event that directly or indirectly contributes concurrently to; or contributes in any sequence to, the loss or damage[.]"). Indeed, Defendants' reading of "ensuing loss" clauses effectively renders them anti-concurrent causation clauses.

### 2.     Defendants' misinterpretation and investigatory failures deprived Ramaco of a path to coverage under an exclusion they cited in the denial letter.

The significance of Defendants' misinterpretation takes form when one analyzes the Planning, Design, Materials, or Maintenance Exclusion, which Defendants cited in Ramaco's denial letter, *see* UMF ¶ 54, and included as an affirmative defense in this case, *see* ECF No. 30 (fourth affirmative defense). That exclusion "does not apply to ensuing loss or damage caused by or resulting from a peril not otherwise excluded." UMF ¶ 7.

Ramaco's policy does not contain an exclusion for falling objects or collapse. *See* UMF ¶ 12. Thus, it was critically important for Defendants to determine whether a design defect or improper maintenance caused the hopper to disconnect from the silo—a possibility they still have not ruled out. *See id.* ¶¶ 74–75. Such a determination would have triggered the Planning,

Design, Materials, or Maintenance Exclusion. As shown in the chart below, which accepts all of Defendants' causation positions, *see id.* ¶¶ 34, 48, 56, 61, 67–69, such a determination would have resulted in coverage for all of Ramaco's ensuing losses—namely, the damage to the concrete silo and the conveyor belt—as well as for business interruption and extra expense.

| Loss/Damage | Caused By | Resulting From | Covered? |
|---|---|---|---|
| Corrosion to the hopper-silo connection | Improper maintenance or design defect | | **No**, because the Planning, Design, Materials, or Maintenance Exclusion excludes losses "caused by" that peril. |
| Hopper disconnected from the silo | Corrosion to the hopper-to-silo connection | Improper maintenance or design defect | **No**, because the "ensuing loss" clause excepts damage "caused by" a "peril not otherwise excluded," and corrosion is excluded by the Rust Exclusion |
| Damage to concrete silo | Falling hopper | Improper maintenance or design defect | **Yes**, both because of the coverage clause, *see supra* Part I, and because the "ensuing loss" clause excepts damage "caused by" a "peril not otherwise excluded," even if it may also "result[] from" an excluded peril, and falling objects are not excluded in Ramaco's policy |
| Damage to conveyor system | Falling hopper | Improper maintenance or design defect | **Yes**, for the same reason expressed in the cell above |

Despite acknowledging that "further investigation may certainly have revealed that . . . a lack of maintenance. . . caused the loss," *id.* ¶ 74, Defendants never determined whether a lack of maintenance actually caused Ramaco's loss, *id.* ¶ 77. Instead, they continue—even now—to believe "there very well *may* be a maintenance component" and purport to "reserve [their] rights to assert [that exclusion] to the extent *further investigation* determines that there clearly was a maintenance issue." UMF ¶ 75 (emphasis added). But the time for further investigation has long since passed. Defendants' failure to investigate this pathway to coverage amounts to bad faith.

35

### 3.   Ramaco's loss also should have been covered under the Mechanical Breakdown Exclusion, which Defendants read out of the policy.

The Mechanical Breakdown Exclusion specifically "does not apply to" any "abrupt and accidental breakdown of **mechanical or electrical system or apparatus** which causes direct physical loss or damage to all or part of that **mechanical or electrical system or apparatus**." UMF ¶ 10. The exclusion goes on to explain that "[a]brupt and accidental breakdown" does not include, among other things, "rust, oxidation, or corrosion" and "faulty, inadequate or defective design, plan, specifications or installation." *Id.* Critically, there is no "caused by or resulting from" language in that portion of the Mechanical Breakdown Exclusion, meaning that corrosion and defective designs are not themselves covered forms of damage but that loss or damage *caused by or resulting from* corrosion or a defective design is recoverable if that loss or damage is "an abrupt and accidental breakdown of **mechanical or electrical system or apparatus**" that causes "direct physical loss" to that system or apparatus. In short, the provision provides coverage for a specific kind of loss—"abrupt and accidental breakdown[s] of mechanical or electrical system[s] or apparatus[es]"—regardless of the peril that causes it.

Here, damage to the conveyor system—which is a "mechanical or electrical system or apparatus," UMF ¶ 92—was caused by the falling hopper. *See id.* ¶¶ 32–34. It is beyond question that such damage was "abrupt and accidental" and that there was "direct physical loss" to the conveyor system. And the damage to the conveyor system was not itself "corrosion." *See* UMF ¶¶ 33–34. Thus, damage to the conveyor system was covered as an "abrupt and accidental" mechanical breakdown. Mr. Gonsalves never assessed this avenue of coverage. *See id.* ¶ 91.

This provision is relevant for a second reason—namely, it is yet another portion of the policy that Defendants' interpretation of the policy would render meaningless. In particular, if the Rust Exclusion and Planning, Design, Materials, or Maintenance Exclusion exclude all loss

or damage caused by or resulting from corrosion or defective design, no matter where those perils sit in the chain of causation, there would be no reason to define an "[a]brupt and accidental breakdown of mechanical or electrical system or apparatus" so as not to include "corrosion" or "defective design." But the Mechanical Breakdown Exclusion does exactly that. *See* UMF ¶ 10. There can be only one reason: Abrupt and accidental breakdowns of mechanical or electrical systems are covered even if they are "caused by" or "result from" corrosion or defective designs. Mr. Gonsalves's failure to analyze this pathway to coverage is further evidence of bad faith.

## III.   RAMACO IS ENTITLED TO ITS NET ECONOMIC LOSS, AN AWARD FOR AGGRAVATION AND INCONVENIENCE, AND ATTORNEYS' FEES.

In West Virginia, "when a policyholder substantially prevails in a property damage suit against an insurer, the policy holder is entitled to damages for net economic loss caused by the delay in settlement, as well as an award for aggravation and inconvenience." *Hayseeds, Inc. v. State Farm Fire & Cas.*, 352 S.E.2d 73, 80 (W. Va. 1986). In addition, the insurer is "liable for the payment of the policyholder's reasonable attorneys' fees," which are "[p]resumptively" one-third of the policy value. *Id.* This rule exists because, "when an insured purchases a contract of insurance, he buys insurance—not a lot of vexatious, time-consuming, expensive litigation with his insurer"—and "[t]o impose upon the insured the cost of compelling his insurer to honor its contractual obligation is effectively to deny him the benefit of his bargain." *Id.* at 79–80.

Here, because Ramaco's loss was a covered event, *see supra* Parts I & II, in addition to its economic damages, it is entitled to a damages award for aggravation and inconvenience and to its reasonable attorneys' fees.

## IV.   DEFENDANTS' CONDUCT WAS MALICIOUS AND IN BAD FAITH.

In West Virginia, punitive damages awards premised on an insurer's bad faith are the exception, not the rule. *See id.* at 80–81. But they remain appropriate where the insured can show

37

that the insurer "actually knew that the policyholder's claim was proper, but willfully, maliciously and intentionally denied the claim." *Id.*

Here, Defendants' conduct unquestionably warrants punitive damages. For example, as discussed above, Defendants' failure to investigate *three* separate pathways to coverage, *see supra* Parts I, II.D.2 & II.D.3, demonstrates that they were acting maliciously. In addition, Defendants' intentional disregard of *Copper River*—a case they controlled, *see* UMF ¶ 26, about a claim they handled, *see id.* ¶¶ 20–22, that involved the exact Rust Exclusion they relied on to deny Ramaco's claim, *see id.* ¶ 16, that was resolved mere weeks before Ramaco's loss, *see id.* ¶¶ 15, 31, and despite the Chief Technical Officer's admitted knowledge of the *Copper River* determination that this Rust Exclusion is ambiguous, which he withheld from the individuals handling Ramaco's claim, *id.* ¶ 88, and another vice president's direct involvement in the adjustment of both claims, and personal involvement in the *Copper River* litigation as a corporate representative, without making any attempt to apply his experience to Ramaco's claim, *id.* ¶¶ 83–86—amounts to bad faith. One need only compare Defendants' extensive and months-long effort to bolster their determination, *as a matter of fact*, that corrosion caused the loss, *see* UMF ¶¶ 56–64, to their nonexistent efforts to determine whether their reliance on the Rust Exclusion was permissible, *as a matter of law*, to confirm the presence of malice here.

The fact that Defendants were precluded from relitigating the issue decided by the *Copper River* is certainly relevant here. *See, e.g.*, *Lewin v. Cooke*, 28 Fed. App'x 186, 197 (4th Cir. 2002) (holding that a litigant's conduct was "frivolous, unreasonable, or without foundation" when it, among other things, "constituted an attempt to relitigate matters already adjudicated"); *Boress v. Reynolds*, No. C 03-2897, 2004 WL 1811193, at *3–4 (N.D. Cal. Aug. 5, 2004) (holding that attempting to relitigate issues "barred by collateral estoppel . . . demonstrates bad

faith"); *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, No. 96 Civ. 3231, 2002 WL 975623, at *10 (S.D.N.Y. May 9, 2002) (holding that litigation "seek[ing] to relitigate claims already adjudicated" was "clearly brought in bad faith"); *Sassower v. Abrams*, 833 F. Supp. 253, 266 (S.D.N.Y 1993) (holding that a litigant's conduct was "vexatious" and "bad faith" because he was "attempt[ing] to relitigate adjudicated matters").

But Defendants' conduct was malicious even if they were not technically precluded from relitigating the question. It is beyond dispute that Defendants are required to apply ambiguous policy exclusions in the insured's favor. *See supra* Parts II.A & II.B. That a federal court held this exact language was ambiguous—even if not preclusive—warranted thoughtful consideration. But Defendants paid the *Copper River* court's determination no mind. *See* UMF ¶¶ 83–88. The proposition that insurance companies are not free to disregard federal courts' determinations about their policy language when denying claims merits no citation.

That Defendants continued to disregard *Copper River* even after Ramaco raised it in this lawsuit confirms malice. Their numerous efforts to hide the truth about their involvement in that case—discussed more fully in Ramaco's motion for sanctions, *see* ECF Nos. 148 & 149— renders the conclusion inescapable. Their failure to document the claim file about their alleged mechanical breakdown analysis violates the West Virginia Unfair Trade Practices Act and similarly demonstrates bad faith. *See* UMF ¶ 93; W. Va. C.S.R. § 114-14-3 (requiring insurers' files to "contain all notes and work papers pertaining to the claim in such detail that pertinent events . . . can be reconstructed" and "notation[s] of the substance and date of all oral communications"). The same is true of their failure to keep track of complaints made against them. *See* UMF ¶ 94; W. Va. Code § 33-11-4(10) ("No insurer shall fail to maintain a complete record of all the complaints which it has received . . . . This record shall indicate the total number

of complaints, their classification by line of insurance, the nature of each complaint, the disposition of these complaints, and the time it took to process each complaint."). Because Defendants were acting maliciously, Ramaco is entitled to punitive damages, in an amount to be set by the jury.

## CONCLUSION

For the foregoing reasons, Ramaco's motion for summary judgment should be granted as to Counts I, II, and III, and all of Defendants' affirmative defenses, leaving only the question of damages for the jury on these counts.

Dated: September 8, 2020                    Respectfully submitted,

                                            /s/ Rebecca D. Pomeroy
                                            Brian A. Glasser, Esq. WVSB 6597
                                            Rebecca Pomeroy, Esq. WVSB 8800
                                            BAILEY & GLASSER, LLP
                                            209 Capitol Street
                                            Charleston, WV 25301
                                            Tel: 304.345.6555
                                            Fax: 304.342.1110
                                            bglasser@baileyglasser.com
                                            bpomeroy@baileyglasser.com

                                            Nicholas S. Johnson, Esq. WVSB 10272
                                            Michael L. Murphy, Esq. WVSB 10888
                                            Joshua I. Hammack (admitted *pro hac vice*)
                                            BAILEY & GLASSER, LLP
                                            1055 Thomas Jefferson Street
                                            Suite 540
                                            Washington, D.C. 20007
                                            Tel: 202.463.2101
                                            Fax: 202.463.2103
                                            njohnson@baileyglasser.com
                                            mmurphy@baileyglasser.com
                                            jhammack@baileyglasser.com
                                            ***Counsel for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th of September 2020, a copy of the foregoing *Plaintiff Ramaco Resources, LLC's Memorandum in Support of Its Motion for Summary Judgment* was filed using CM/ECF, the Court's electronic notification system, which provided notice to all counsel of record.

/s/ Rebecca Pomeroy
Rebecca Pomeroy

2