UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

RAMACO RESOURCES, LLC,

       Plaintiff,

v.                         Civil Action No. 2:19-cv-00703

FEDERAL INSURANCE COMPANY; and
ACE AMERICAN INSURANCE COMPANY,

       Defendants.

MEMORANDUM OPINION AND ORDER

       Pending are the motion for summary judgment of plaintiff Ramaco Resources, LLC, and the motion for summary judgment of defendants Federal Insurance Company and ACE American Insurance Company, both filed on September 8, 2020. ECF Nos. 151, 154.

I. Background

       This action involves an insurance claim arising out of the collapse of a hopper inside plaintiff's raw coal silo, which damaged the base of the silo and the coal conveyor belt underneath. Despite extensive briefing from the parties raising myriad arguments, the core dispute in this case is a simple one: whether plaintiff's hopper detached from the silo because of a

sudden shift in the weight of coal in the silo, a covered peril, or whether it collapsed because the weld attaching the hopper to the silo was weakened by corrosion, an uncovered peril.

A. **The Parties**

Plaintiff Ramaco Resources, LLC ("Ramaco") is a publicly traded company that mines, processes, and sells metallurgical or "met" coal, which is primarily used in steel manufacturing processes.  Zaluski Dep. 281, ECF No. 154-6.

Defendants Federal Insurance Company ("Federal") and ACE American Insurance Company ("ACE") are both insurance companies.  Defs.' Decl. ¶¶ 2, 3, ECF No. 173-11.  Federal is directly owned, and ACE is indirectly owned, by Chubb INA Holdings Inc.  Id. at ¶ 4.  Federal utilizes claims personnel who are employees of ACE, including the claims personnel who handled plaintiff's claims.  Id. at ¶ 13.

B. **Events Prior to the Failure Event**

Plaintiff acquired the Elk Creek property in 2012 in Verner, West Virginia, in Logan County.  Annual Report 8, ECF No. 154-7.  That property consisted of 17,128 acres, including 24 seams containing high-quality met coal that plaintiff had targeted for production.  Id. at 9.  The property had previously been operated by the Island Creek Coal Company, which ceased

2

coal production and decommissioned the preparation plant and coal-handling facilities in 1999.  Id.

In 2016, plaintiff hired Raw Resources, LLC ("Raw") to build a new coal preparation plant at Elk Creek and hired an independent contractor named Rob Robertson to supervise.  Alvis Dep. 10, 43, ECF No. 154-8.  Construction of the preparation plant began in September 2016 and the plant began processing in October 2017.  Id. at 49.  According to Christopher Blanchard, plaintiff's Chief Operating Officer, the plant was intended to run continuously; however, between October 2017 and March 2018, the plant ran on a five day a week schedule as some construction work on the plant continued.  Blanchard Dep. 36-37, ECF No. 154-9.  Normal, seven day per week operations commenced in March 2018.  Id. at 36.

In addition to building the new coal plant, Raw was contracted to refurbish three existing raw coal silos.  Alvis Dep. 10.  The three silos were built in 1978 and decommissioned at some point in the 1990s.  Bauersachs Dep. 134, 166, ECF No. 154-5.  The silos are open-top structures, made of concrete and metal.  Alvis Dep. 12.  While decommissioned, the silos were filled with dirt and raw coal to the point where the silo connected to the hopper.  Bauersachs Dep. 134; Alvis Dep. 12-13.

Michael Bauersachs, plaintiff's CEO, determined, on the advice of Rob Robertson, that the existing silos would be usable if rehabilitated.  Bauersachs Dep. 166.  In relation to the silos, Raw was contracted to "clean and remove debris, replace cones (if required), replace cone liners, repair steel structures and fit new feed conveyors, flop gates and feeders." Alvis Dep. 72-73.  Raw removed the dirt and coal in the silos, as well as plant life that had accumulated in the silos, including a tree that had grown in one silo and some additional vegetation in all three.  Id. at 12.

At the time of the clean-out work, Raw observed some cracks in the interior concrete of the silos, as well as rust on the visible steel elements of the silo interior.  Id. at 25-26. Raw's structural engineer recommended to Robertson that plaintiff obtain "a structural inspection by a qualified Professional Engineer with experience in silo construction and design . . . while the silos are clean, and easily accessible for inspection."  ECF No. 154-10.  Plaintiff's in-house counsel, Daniel Zaluski, who directed the cause of loss investigation, testified that he was unaware of anyone at Ramaco being "made aware of this recommendation."  Zaluski Dep. 281.

The hopper in each silo was connected to a circumferential embedded steel plate on the wall of the silo by

a "fillet weld," which bore the weight of the hopper and the
coal inside.  WJE-1 at 4, ECF No. 154-14.  Some silos are
constructed with an independent support structure for the hopper
- typically a concrete column with a cement pad - but none of
plaintiff's silos had such a support system at the time of the
failure event.  Mamone Dep. 47, ECF No. 154-11.  The welds that
connect the hoppers to the embedded steel plates were original
to the 1978 silos and were not repaired or modified after
plaintiff purchased Elk Creek.  Bauersachs Dep. 99.

While Raw, through its representative Andrew Alvis,
did testify to the presence of corrosion on the visible steel
elements of the silo, it also indicated that it was unaware of
"any issue with the fillet weld" and that if Raw employees had
"observed a safety issue related to the fillet weld, it [Raw]
would have alerted Ramaco."  Alvis Dep. 74.  There is no record
that an inspection of the silos' structure or their welds was
ever conducted prior to the failure event.  Blanchard testified
that he was not aware of "any time prior to [the failure event]
that the welds were inspected by a structural engineer" and that
the work done prior to commencing operations "would probably be
the last time they were looked at."  Blanchard Dep. 96.

According to Blanchard, the Elk Creek facility was
fully operational by March of 2018.  Blanchard Dep. 36.  The way

operations were run, raw coal was mined out of the various mines on the Elk Creek property and was trucked to an area of the preparation plant called the "truck dump." Id. at 39. The raw coal was processed in a "sizer," in which the raw coal was crushed into fragments less than four inches in size. Id. at 42. The sized raw coal was then moved by a "feed conveyor" 96 feet into the air, to the top of the middle silo (Silo 2). Id. at 40-42. Directly below and perpendicular to the feed conveyor was a short "transfer conveyor," which allowed coal to be moved into Silos 1 or 3, on either side of Silo 2. Id. at 44-45. Coal could be discharged out of the silos by the opening or closing of a hydraulic gate at the bottom of the silos, onto a "silo reclaim" conveyor. Id. at 48.

Plaintiff routinely ran into issues involving the flowability of raw coal out of the silos, which was generally moist and mixed with clay, stemming from one of two issues. Id. at 57-59. First, the raw coal would clog the discharge port of the hydraulic gate. Id. at 58. Second, the coal would stick together inside the silo, forming an arch or bridge, "creating a void underneath." Id. Plaintiff's employees utilized two methods for clearing coal to allow improved flow in either case. Id. at 59-62. First, employees sometimes used metal tools to dislodge raw coal or to break up clumps. Id. Second, they

sometimes used firehoses at the top or bottom of each silo to loosen the coal or break the arch. Id. The water generally caused the coal to flow out in a liquid-like sludge. Id. at 72.

Plant personnel monitored the flowability of the raw coal from a control room. Id. at 65-66. When the control room was alerted to a drop in flowability, it would dispatch additional plant personnel to investigate the flowability issue and utilize one of the methods for dislodging coal. Id. at 67.

C. The Failure Event

The failure event giving rise to the insurance claim at issue occurred around 12:00 PM on November 5, 2018. Id. at 110. During that morning, all three silos were measured to be mostly empty for most of the morning. Id. at 76. Knowledge as to how much coal was flowing immediately prior to the failure event is limited. As Blanchard explained, the measuring apparatus, which measures the volume inside the silo by radar, is imperfect and may read the silo as empty, even when there is coal inside. Id. at 43-44. Further, the production reports, on which Blanchard based his knowledge, only represent snapshots of each hour and one could not determine, for example, "how many minutes in each hour each one of the silos was in operation." Id. at 79. The production reports were produced by control room personnel manually recording the radar system's output in a

spreadsheet.  Id. at 28-29.  Blanchard did not know when, during the one-hour intervals the snapshots were taken, and it is not otherwise established by the record.  See id. at 33-35.

There is no record of any issues related to the flowability of the coal inside Silo 1 on the morning of November 5, 2018.  Id. at 84.  This could either be because there was no flowability issues or because the control room personnel failed to observe or record one.  Based on Silo 1's reading closest in time to the failure event, there were between 1,031 and 1,334 tons of raw coal in the silo at the time of failure.  Mamone Supp. Report, ECF No. 172-1.

At some point between 12:00 and 1:00, the hopper detached from the silo wall, fell about twenty feet, and damaged the base of the silo and the conveyor system, forcing operations to halt.  Nicolaro Dep. 154-55, ECF No. 151-4; Mamone Report SK-01, ECF No. 172-2.  There was no damage to Silos 2 and 3. Hungate Dep. 108, ECF No. 154-17.  The details of the hopper-silo connection were not known to plaintiff at the time of the failure event.  Blanchard Dep. 137-38.  Physical damage was sustained only to the hopper, Silo 1, and the reclaim conveyor. The other two coal silos were not themselves damaged.

D. Insurance Claim and Investigation

At the time of the failure event, the three silos were covered as a single building under an all-risk property insurance policy issued by defendant Federal.  Policy FIC_008579, ECF No. 154-16; Resps. to Pl.'s Reqs. for Admis. 5, ECF No. 151-17.

Shortly after the failure event, Bauersachs contacted plaintiff's insurance broker, Peter Gibson of USI Insurance Services, to notify him of the loss.  Gibson Dep. 75, ECF No. 154-19.  Gibson provided notice to defendants on November 6, 2018.  Id. at 80.  On November 7, 2018, defendant Federal sent an independent insurance adjustor from a firm referred to as "Sedgwick," to assess the damage.  Zaluski Dep. 103.

Plaintiff's retained engineer on site, Robert Hungate, advised that if plaintiff continued to use Silos 2 and 3, new structural steel support should be added underneath the hoppers to prevent a similar collapse.  Hungate Letter 3, ECF No. 154-15.  Hungate also recommended the demolition of Silo 1 by an experienced demolition contractor, given the extensive damage to the silo.  Id.  Hungate did not form an opinion as to the cause of the collapse.  Hungate Dep. 235, ECF No. 154-21.

On November 8, 2018, Gibson met with Bauersachs, Blanchard, Zaluski, and CFO Michael Windisch to discuss coverage.  Gibson Dep. 86; Bauersachs Dep. 40-42.  At the meeting, Gibson discussed exclusions and plaintiff's post-loss duties.  Id.  Following the meeting, Zaluski was given responsibility for overseeing the insurance claim process and coordinating communication with Federal.  Bauersachs Dep. 56; Zaluski Dep. 83-85.

Federal assigned one of its general adjusters, Frank Gonsalves, to evaluate plaintiff's claim.  Gonsalves Dep. 100, ECF No. 154-22.  Gonsalves, in coordination with his manager, Michael Nicolaro, hired an engineering firm Wiss, Janney, Elstner Associates ("WJE") to investigate the cause of the failure event.  Id.  The investigation was led by Dr. Glenn Rentschler, PE, PhD, a structural engineer and senior principal with WJE.  WJE Decl. ¶¶ 2, 4, ECF No. 154-14.  Gonsalves and Zaluski spoke on November 12, 2018 and Gonsalves issued a reservation of rights letter, identifying the potential that damages may be excluded as caused by wear and tear or planning, design, materials or maintenance.  Gonsalves Letter, ECF No. 154-25.

On November 14, 2018, Gonsalves and Rentschler visited Elk Creek and met with Blanchard and Zaluski.  Blanchard Dep.

134-35.  Blanchard spent about one hour explaining the operations at Elk Creek and what information plaintiff had compiled regarding the failure event.  Id. at 135.  Gonsalves and Rentschler met with plaintiff's Chief Accounting Officer, John Marcum.  Id.  Finally, Gonsalves and Rentschler were able to go inside of Silos 2 and 3 but were unable to see the hopper attachment on Silo 1, since it was still covered with raw coal at the time.  Id. at 134-35.

During the November 14 site visit, plaintiff was engaged in an ongoing process of demolishing Silo 1, which defendants' representatives observed.  Rentschler Dep. 98-99, ECF No. 151-16; Gonsalves Dep. 265-66, ECF No. 151-13.  Prior to the demolition, on November 9, 2018, Gibson had informed defendants' employees by email that plaintiff planned to tear down Silo 1 and requested more details as to what to expect regarding the claims process.  ECF No. 153-2.  There is no record that plaintiff was given further instruction at that time.  Plaintiff retained the hopper itself but did not retain the concrete silo, including the metal structures embedded in the concrete that formed the point of failure.  Zaluski Dep. 185.  Gonsalves instructed plaintiff to preserve the hopper but did not give any additional instructions regarding the remainder of Silo 1.  Zaluski Dep. 300-01.  WJE did not give instructions

to plaintiff regarding preservation of evidence until May of 2019, several months after demolition.  Rentschler Dep. 204-05.

Rentschler returned to Elk Creek on November 29, 2018 to continue WJE's investigation.  WJE Decl. ¶ 17.  At this point, he was able to observe the top edge of the hopper, which had rust and a fractured weld on it.  Id.  He determined that a metallurgist should assess the rust and the fractured weld.  Id. When Zaluski on December 3, 2018 learned that defendants wanted to conduct a third site visit and enlist a metallurgist, he expected that litigation would ultimately be necessary to recover on the claim.  Zaluski Decl. ¶ 4, ECF No. 154-26.

On December 3, Zaluski discussed defendants' plan with Blanchard and Randall Atkins, plaintiff's Chairman at the time. Zaluski Decl. ¶ 5.  Blanchard then engaged an engineering firm, Cintar Systems, Inc. ("Cintar"), to conduct their own investigation as to the failure event and provide related consulting services.  Id. at ¶ 6.  Cintar had also already been retained to provide engineering consulting related to Silos 2 and 3.  Id.

Rentschler returned to Elk Creek on December 14, 2018, with the metallurgist, Robert Warke, for WJE's third site visit. WJE Decl. ¶ 17.  WJE issued its initial report as to causation on January 4, 2019.  WJE-1, ECF No. 154-14.  That report

concluded that the collapse was caused by "corrosion and loss of section at the embedded plate, the top edge of the hopper, and/or at the connecting fillet weld at the notch in the interior silo wall surface." Id. at 6. Plaintiff received the report on January 9, 2019. Gibson 121-22. Plaintiff voiced its disagreement with the methodology and what it considered to be equivocal language in the report but did not yet have its own theory as to causation. Blanchard Dep. 179-82.

The January 4, 2019 report was reviewed by Gonsalves, his manager, Nicolaro, Nicolaro's manager, Tim Blake, and Kurt Chapin, the Chief Technology Officer for defendants. Chapin Dep. 64. This committee determined that, based on the report's finding that corrosion was the cause of loss, coverage should be denied under the policy. Id. at 67-68. On January 18, 2019, Federal informed plaintiff by letter that it would not extend coverage to the failure event. ECF No. 154-28. The letter also invited plaintiff to furnish any additional information it thought might bear on the coverage decision. Id.

Plaintiff sent a response letter to Federal on February 1, 2019, contending that WJE's report was "artfully worded" and indeterminate as to a definitive cause of failure. ECF No. 154-29. Plaintiff stated that "we agree with the report that it is likely not possible to find the definitive cause of

13

failure." Id.  It also indicated that the "leading and most logical cause of failure is a failure to a welded joint that attached to the embedded plate in the concrete silo wall," and not corrosion.  Id.  WJE responded to plaintiff's contentions by letter, which was forwarded to plaintiff on February 21, 2019, disagreeing with plaintiff's positions.  ECF No. 154-30.

Employees of both plaintiff and defendants met on March 28, 2019 to discuss the claim further.  Plaintiff's retained engineers from Cintar presented its alternative theory of the cause of loss, as well as the ongoing work at Elk Creek to restart operations.  Blanchard Dep. 169.  Cintar explained its theory that the failure was caused by coal in the silo sticking together, forming an arch with a void underneath, and then suddenly collapsing, overstressing the welds.  Id.  Cintar did not present a written engineering report and the presentation it showed did not mention the coal arch theory. Id.; Zaluski Dep. 251-52.

In response to plaintiff's concerns with WJE's report, on April 4, 2019, WJE recommended additional investigation, including laboratory testing of the steel on the hopper, as well as inspection inside of Silos 2 and 3.  WJE-3, ECF No. 154-14. While plaintiff offered to accommodate an inspection of the remaining silos by use of man lifts and inspection from

14

underneath, they indicated that the coal silos would not be
emptied due to the high volume of coal that was being processed
at the time.  ECF No. 171-22 (April 17, 2019 email from Zaluski
to Gonsalves).  While WJE did not have the opportunity to
inspect the remaining silos, it was able to do laboratory
testing and conduct a mathematical analysis relating to Silo 1.
WJE Decl. ¶ 13.  WJE believed that the findings of these
analyses were consistent with its initial corrosion causation
determination and issued reports on June 19, 2019 and August 20,
2019 concerning these investigatory tasks.  Id. at ¶¶ 12, 13.

E. Resumption of Operations

      Because the hopper collapse damaged the conveyor belt
that brought raw coal into the preparation plant, plaintiff's
operations were disrupted without a replacement conveyor.
Plaintiff constructed a temporary conveyor belt, which was
operational on December 1, 2018.  ECF No. 156-4 (email from
Blanchard).  The temporary belt allowed operations to commence
but only at about 55-65% of its capacity.  ECF No. 156-5 (email
from Ramaco counsel to lender).

      Plaintiff constructed a new permanent conveyor, which
was initially scheduled for completion on December 30, 2018 but
was not completed until February 28, 2019.  Bauersachs Dep. 196-
97.  These delays were largely due to delays in fabrication of

construction materials off-site, as well as miscellaneous unspecified causes.  Id. at 197.

Plaintiff also undertook to add support structures underneath Silos 2 and 3 per Hungate's recommendation.  Kostic Dep. 55-60.  Plaintiff did so to ensure employee safety and to avoid scrutiny by the Mine Safety and Health Administration (MSHA).  Id.  Plaintiff has not sought payment from the defendants for the modifications it made to the two silos.  Silo 1 was never replaced.

Plaintiff instituted this suit on August 21, 2019. Notice of Removal, ECF No. 1.  Following the September 27, 2019 removal of this case, plaintiff filed its amended complaint on November 12, 2019.  Notice of Removal; Amend. Compl., ECF No. 14.  Plaintiff seeks declaratory judgment, including a judicial declaration that it is entitled to reimbursement for all amounts owed under the policy and that defendants have an ongoing duty to reimburse it for additional covered amounts (Count I), alleges breach of contract against defendant Federal (Count II), breach of the duty of good faith and fair dealing against defendant Federal (Count III), and violation of the West Virginia Unfair Trade Practices Act ("UTPA") against defendants (Count IV).  Amend. Compl. 18-22.

Defendants pled six policy exclusions as affirmative defenses: the "Acts or Decisions Exclusion," the "Business Errors Exclusion," the "Inherent Vice / Latent Defect Exclusion," the "Planning, Design, Materials, Maintenance Exclusion," the "Wear and Tear Exclusion," and the "Rust Exclusion."  Answers to Amend. Compl., ECF Nos. 29, 30.

Both parties have moved for summary judgment. Plaintiff has also moved to supplement its summary judgment briefing based on documents and expert testimony produced by defendants after the close of discovery pursuant to the magistrate judge's order compelling production.  ECF Nos. 200-1, 261.  Defendants oppose the motion to supplement, inasmuch as they contend it is an improper attempt to file a sur-reply and that plaintiff had the opportunity to seek an extension of the dispositive motions deadline, which it failed to take.  Though the evidence presented in the supplement is not dispositive in determining the summary judgment motions, the court considers it as well.

## II. Standard of Review

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those necessary to establish the elements of a party's cause of action. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see</u> <u>also</u> <u>News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.</u>, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248.

Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962). A party is entitled to summary judgment if the record, as a whole, could not lead a rational trier of fact to find for the non-moving party. <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991). Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. <u>Anderson</u>, 477 U.S. at 248.

III. Discussion

The insurance policy at issue covers "direct physical loss or damage to" a "building" or "personal property" "caused by or resulting from a peril not otherwise excluded."  Policy at FIC_008593.  It is undisputed that the silos are covered as buildings for this purpose and the conveyor system is personal property.  As it relates to the first three counts, which all center on whether defendants breached the contract through non-payment on these losses, defendants argue that their theory of causation, if accepted, invokes the "Rust Exclusion" and the "Wear and Tear Exclusion," and that based on plaintiff's experts' testimony, plaintiff's theory of causation invokes the "Inherent Vice / Latent Defect Exclusion."  Plaintiff primarily argues that these provisions do not apply because they are ambiguous and because most of its losses were directly caused by a falling object, rather than corrosion, even under defendants' theory.  Plaintiff also argues that defendants are precluded from arguing that the Rust Exclusion is not ambiguous based on the participation of a company related to defendants in a prior case, Copper River v. Chubb Custom Insurance, Co., 2018 WL 6220064 (D. Alaska September 19, 2018), which will be discussed.

Defendants move for summary judgment as to most of plaintiff's claimed damages, including punitive damages and

19

<u>Hayseeds</u> damages, and as to Count IV (UTPA), as unsupported by admissible evidence.  Plaintiff argues that defendants' determination that corrosion was the sole cause of loss requires dismissal of all defenses other than those based on the Wear and Tear and Rust Exclusions.

### A. <u>Causation Theories</u>

Central to this case are the parties' divergent theories as to what caused the silo to collapse, primarily informed by the opinions of their respective expert witnesses. There is a marked dispute as to whether the failure event was caused by the weld being rendered ineffective by corrosion, as defendants contend, or whether it was caused by raw coal sticking together and forming an arch, which then collapsed inside the silo, thus destroying the weld, as argued by the plaintiff.  If defendants' theory is correct, then the peril falls within the Rust Exclusion, the Wear and Tear Exclusion, and potentially the Inherent Vice / Latent Defect Exclusion, precluding coverage for the collapse.  If plaintiff's theory is correct, the peril does not fall within any of these exclusions and plaintiff would be entitled to coverage.

There is no material dispute as to the basic structure of the silo and the conical steel hopper.  The top of the hopper plate was connected by a fillet weld to a 3/8" thick continuous

steel plate that was embedded in the circumference of the 13"
thick concrete wall of the silo.  The embedded steel plate was
connected to the concrete wall with reinforcing bar anchors.
The top of the hopper appears to have been connected to the
embedded plate through a continuous lap joint fillet weld, i.e.,
one between overlapping metals that are welded together at their
respective edges, which was the sole support keeping the hopper
suspended above the ground.  It is also undisputed that the
point of failure was at the weld site between the hopper and the
embedded plate.

Likewise, it is not disputed that the three silos were
built in 1978, with the hoppers themselves being original to
those silos.  The silos were utilized by the prior owner until
being decommissioned in the 1990s, when they were filled with
dirt and sediment until being recommissioned in 2017.  There is
no record that the silo-to-hopper connections, including the
weld, were ever inspected, improved, or maintained in the
intervening years.  The top of the silos were open and exposed
to the elements.  Moreover, it is undisputed that the interior
of the silos were moist environments when coal was present, and
that plaintiff utilized firehoses to break up clogged coal.

Defendants' theory of causation relies on the opinions
of three engineers — Dr. Rentschler, Dr. Altstadt, and Mr. Warke

21

who opined that the weld failed because of corrosion.  The
January 4, 2019 report, the first to identify corrosion as the
cause of loss, was based on Rentschler and Warke's observations
over the course of three site visits.  Based on its observations
and conversations with plaintiff's employees, WJE concluded that
the weld, the hopper plate, and the embedded plate, were
susceptible to corrosion because they were not made of stainless
steel and did not have a stainless-steel lining.  WJE-1 at 6.
Moreover, the silo, hopper, and weld experienced 20 years of
exposure to moisture from wet coal when in use from 1978 until
the late 1990s, and then to rainwater for another 20 years while
not in use, due to the open-top structure of the silo.  Id.
The weld was then exposed to moisture from coal again from 2017
until the time of loss in November 2018.  Id.  Rentschler
observed significant rust and section loss on and around the
fractured weld.  WJE Decl. ¶ 17.

        WJE also performed a laboratory investigation of
samples from the top edge of the hopper and the embedded plate,
which revealed that parts nearest to the weld had lost more
thickness than parts further from the weld, suggesting a greater
degree of corrosion near the point of failure.  WJE-4 at 2-3.
Finally, Dr. Alstadt performed a "Finite Element Analysis,"
which utilizes complex equations to quantify various factors,

such as stress, strain, and displacement.  WJE Decl. ¶ 13.  The results of this analysis were consistent with the finding that corrosion was the cause of loss on Silo 1.  Id.

Plaintiff does not contest the presence of corrosion at or around the weld, but insists that corrosion was not the cause of failure.  Their theory of loss is based on the opinion of Frank Mamone of SEI Engineers, Inc., who opined "that corrosion was not the predominant cause of the hopper failure," and instead that "material flow problems caused a stable arch that collapsed, producing a large impact load on the hopper." Mamone Report 11, ECF No 172-2.  Mamone conducted a site visit on November 7, 2019, observed the remaining debris of the hopper and Silos 2 and 3, and discussed the operation of the mine with plant personnel.  Id. at 2.  Using samples of coal from Elk Creek, Mamone determined the likely cohesiveness and the flowability of the material in the silo at the time of failure. Id. at 3.  Mamone concluded that the cohesiveness of the coal, as well as the history of coal arches forming in the silos, were consistent with a coal arch forming immediately prior to failure.  Id. at 8.  Moreover, he concluded that photographs of the hopper after the failure event, showing it upright, suggest that it fell uniformly, which would be inconsistent with the corrosion theory, inasmuch as the corrosion theory involves a

single detachment point, followed by a gradual "unzipping" of the remaining weld length.  Id.  Finally, he found that since the hopper had recently held a much greater weight of coal than that which was in the silo at the time of failure, the coal had likely been moving immediately prior to the failure event, thus imposing greater force than stationary coal.  Id.

These competing and mutually exclusive theories cannot be resolved on summary judgment.  If defendants' theory is correct, then the peril that caused this loss can be fairly described as "corrosion" or "deterioration," as those terms are ordinarily used.  Moreover, if defendants are correct that the use of non-stainless steel or lack of stainless-steel lining on the weld resulted in corrosion that brought about the failure, then that may fairly be described as a "latent defect."  If plaintiff is correct, then the failure was caused by the collapse of a coal arch rather than by corrosion, which would invoke no exclusions.

The Rust Exclusion, defendants' Sixth Affirmative Defense, states that "[t]his insurance does not apply to loss or damage caused by or resulting from rust, oxidation, corrosion or discoloration."  Policy 171.  As stated, whether corrosion was the cause of loss remains a disputed issue of material fact.  Plaintiff argues that the Rust Exclusion is ambiguous and should

24

be construed to bar recovery only as to what it calls
"superficial corrosion," as opposed to "structural corrosion."[1]
Plaintiff observes that the first three terms of the exclusion,
"rust," "oxidation" and "corrosion," could apply to both
structural or superficial problems, whereas the fourth term,
"discoloration," could only apply to superficial problems.
Utilizing the interpretive canons of noscitur a sociis and
ejusdem generis, the plaintiff argues that it would be
reasonable to read the first three terms to be of like kind to
the fourth, that is, so that they only cover superficial damage.

        The task of a court interpreting the language in an
insurance policy is to give it its plain, ordinary meaning.
Murray v. State Farm Fire and Ins. Co., 509 S.E.2d 1, 6 (W.Va.
1998).  The court finds that the word "corrosion" in the rust
exclusion is unambiguous in this context and the proposed
interpretation by plaintiff is not a reasonable one.  The plain,
ordinary meaning of the word "corrosion" unambiguously
encompasses both superficial and structural damage in its
ordinary meaning or usage, but it does not cover one kind of
damage to the exclusion of the other.  To adopt plaintiff's

---

[1] Plaintiff does not explain in its motion for summary judgment
what is meant by superficial or structural corrosion.  The court
proceeds on the assumption that defendants' causation theory
entails structural, rather than superficial corrosion.

reading of the clause would amount to rewriting the contract to add the word "superficial" prior to each of the first three words in the list.  Such an interpretation would contravene the clear text of the contract.

Moreover, nothing in the definition of "corrosion" would appear to confine it to merely superficial damage. Corrosion is undefined in the policy, but in the insurance context, courts have found it to mean "the chemical or electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the materials and its properties."  Bishop v. Alfa Mut. Ins. Co., 796 F. Supp. 2d 814, 816 n.1 (S.D. Miss. 2011) (quoting In re Chinese Manufactured Drywall Prods. Liab. Litig., 706 F.Supp.2d 655 (E.D. La. Apr. 8, 2010)).

"Because the exclusion is readily understood in accordance with the plain meaning of its language, this Court need not employ extraordinary canons of construction."  TravCo Ins. Co. v. Ward, 736 S.E.2d 321, 328 (Va. 2012).  Under West Virginia law, the interpretive canons are employed to resolve ambiguities where they exist, not to generate ambiguity where there is none.  "Where the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be

given to the plain meaning intended." _Farmers & Mechanics Mut._
_Ins. Co. v. Allen_, 778 S.E.2d 718, Syl. Pt. 1 (W.Va. 2015)
(quoting _Keffer v. Prudential Ins. Co. of America_, 172 S.E.2d
714, Syl. (W.Va. 1970)).  The Court in _Keffer_ explained the
rationale for this rule as follows:

> The question of construction of a contract of
> insurance, as of the construction of contracts
> generally, can arise only when the language of the
> contract is in need of construction.  If the language
> employed is unambiguous and clear, there is no
> occasion for construction.  Stated differently, resort
> to general rules for the construction of an insurance
> policy is unnecessary where the contract is
> unambiguous and its meaning is clear.  The court is
> bound to adhere to the insurance contract as the
> authentic expression of the intention of the parties,
> and it must be enforced as made where its language is
> plain and certain.  This means that the terms of an
> unambiguous insurance policy cannot be enlarged or
> diminished by judicial construction, since the court
> cannot make a new contract for the parties where they
> themselves have employed express and unambiguous
> words.

172 S.E.2d at 715.

Plaintiff nevertheless relies heavily upon _Copper
River_.  2018 WL 6220064.  In that case, the court found that the
words "rust, oxidation, and corrosion" were ambiguous when
followed by "discoloration," being a policy exclusion with the
same language as the one at issue here.  _Id._  The court
concluded that while the insurer's interpretation of the words
"rust," "oxidation," and "corrosion," as encompassing both
structural and superficial damage was a reasonable one, the

insured's narrower interpretation, that it only applied to superficial damage, was reasonable because one out of four words in the list, discoloration, could be understood as only embracing superficial damage.  Id.  As explained above, under West Virginia law, there is no need for construction of unambiguous language that is clear on the face of the policy.

The Copper River court's conclusion that the exclusion language is ambiguous is distinguishable inasmuch as it relied on portions of an insurance policy that are not present in the policy at issue here.  In particular, the court considered "the strongest support" for the insured's position, which it ultimately adopted, to be the fact that the insurer's broad interpretation of the Rust Exclusion would make the "Hidden Decay" provision of the policy superfluous.  Id. at *5.  That policy excluded coverage under a so-called "Collapse Exclusion" for loss or damage caused by or resulting from "falling down or caving in of all or any part of a structure."  Id.  That exclusion contained an exception, called the "Hidden Decay" provision, part of a broader provision which reinstated coverage otherwise falling under the Collapse Exclusion if the loss was caused by "the actual abrupt falling down or caving in of all or any part of a structure caused by or resulting from . . . decay that is hidden from view, unless the presence of such decay is

known to an insured prior to the actual abrupt falling down or caving in of all or any part of a structure." Id.  The Rust Exclusion did not have such a provision reinstating coverage. Id.  The court reasoned that, given the overlap in the ordinary meanings of corrosion and decay, the insurer could invoke the corrosion exception under the broader definition and effectively cancel out the provision reinstating coverage under the Hidden Decay provision.  Id.  The court concluded that the narrower definition of corrosion would allow for both the Rust Exclusion and the Hidden Decay provision to function and left no portion of the policy useless or inexplicable.  Id. at 6.  The policy provision at issue in this case has neither the Collapse Exclusion, nor the exception to the exclusion in the Hidden Decay provision.  Thus, the factor which the Alaska court considered to be most significant in finding and resolving ambiguity is not present here and does not undermine the plain meaning of corrosion, which unambiguously covers both superficial and structural damage within the context of this insurance policy.

These differences also highlight why defendants are not collaterally estopped from relitigating whether the Rust

Exclusion covers structural damage, as plaintiff argues.[2]

Applying collateral estoppel "forecloses the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [collateral estoppel] is asserted had a full and fair opportunity to litigate." Sedlack v. Braswell Servs. Group, Inc., 134 F.3d 219, 224 (4th Cir. 1998) (internal quotation marks and citation omitted). Whether a federal court judgment has preclusive effect is determined by federal common law. See Semtek Int'l v. Lockheed Martin Corp., 531 U.S. 497, 507–08 (2001). "For judgments in diversity cases, federal common law incorporates the rules of preclusion applied by the State in which the rendering court sits." Id. Thus, West Virginia's rules of collateral estoppel apply.

Under West Virginia law, the doctrine of collateral estoppel, also called issue preclusion, bars litigation of a disputed issue where four factors are present:

> (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a

---

[2] Plaintiff's argument is predicated on the involvement of a company related to defendants in the Copper River case, Chubb Custom Insurance, Co. The court does not reach whether either defendant is in privity with Chubb Custom.

> prior action; and (4) the party against whom the
> doctrine is raised had a full and fair opportunity to
> litigate the issue in the prior action.

State v. Miller, 459 S.E.2d 114, Syl. Pt. 1 (W.Va.1995).

Plaintiff has not established the elements of collateral estoppel, most notably the requirement that the identical issue be presented in the action in question. The analysis applied by the Alaska court in Copper River was substantially predicated on the Hidden Decay provision of the insurance policy which is not present in plaintiff's insurance policy. In ascertaining the meaning of insurance contracts, courts must "construe all parts of the document together." Payne v. Weston, 466 S.E.2d 161, 166 (W.Va. 1995). Thus, even though the language of the Rust Exclusion is identical to that before the Alaska court, the policies differ in material ways and the high bar of identicality of issues is not met here. Accordingly, the provision here unambiguously applies to structural corrosion and defendants are not issue precluded from relitigating the point. Therefore, the Rust Exclusion is not ambiguous as applied, and the applicability of the Rust Exclusion, and with it defendants' obligation to pay under the

contract, hinges on the accuracy of defendants' theory of causation.[3]

The same is true for the Wear and Tear Exclusion, defendants' Fifth Affirmative Defense. The policy provides that "[t]his insurance does not apply to loss or damage caused by or resulting from wear and tear or deterioration." Policy at FIC_008608. Deterioration is "the gradual worsening of an object due to natural causes." Libbey Inc. v. Factory Mutual Ins. Co., 2007 WL 9757792 at *4 (N.D. Ohio June 21, 2007) (citing Cavalier Group v. Strescon Industries, Inc., 782 F.Supp. 946, 955-56 (D. Del. 1992)). Courts have applied similar exclusions for deterioration to losses resulting from corrosion of metal. Reliance Ins. Co. v. Cooper/T. Smith Corp., 2001 WL 530438, at *2 (S.D. Ala. Apr. 24, 2001) ("[T]his Court determines that the word 'deterioration', as used in this policy, incorporates within its meaning the term 'corrosion'"); Murray v. State Farm Fire & Cas. Co., 219 Cal. App. 3d 58, 64

---

[3] Though not argued by defendants, it is also doubtful that the doctrine of collateral estoppel even applies to the issue which plaintiff has identified for preclusion, inasmuch as the issue relates to an unmixed question of law. See 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4425 (3d ed. 2021) ("[P]reclusion does not extend to principles of law formulated in abstract terms that could apply to completely separate fact settings"). Under West Virginia law, "[t]he question as to whether a contract is ambiguous is a question of law to be determined by the court." Am. States Ins. Co. v. Surbaugh, 745 S.E.2d 179, 186 (W. Va. 2013).

(Ct. App. 1990) ("[T]he exclusion for 'deterioration' means that [the insurer] is not obligated to compensate the [insured] for their corroded water pipe").

Plaintiff argues that both "wear and tear" and "deterioration" are ambiguous as to whether they encompass corrosion and that reading "deterioration" in the Wear and Tear Exclusion to encompass corrosion renders the word "corrosion" in the Rust Exclusion surplusage. Despite contending the terms are ambiguous, plaintiff does not offer an alternative meaning for this provision, but instead merely insists that the terms cannot encompass corrosion if corrosion is excluded under another policy provision.

Because corrosion is a process which often results in deterioration of the item subject to the corrosion, substantial overlap in real-world application of these provisions is to be expected. Despite that overlap, neither word necessarily encompasses the other. For example, some courts have construed "deterioration" in exclusions to only apply to natural causes, as opposed to non-natural causes, such as negligent construction or exposure to artificial chemicals. Libbey Inc. v. Factory Mutual Ins. Co., 2007 WL 9757792 at *4 (N.D. Ohio June 21, 2007; Cavalier Group v. Strescon Industries, Inc., 782 F.Supp. at 956 (D. Del. 1992). Additionally, courts have at times construed

the word to only apply to slow-moving deterioration or
disintegration.  <u>Butki v. United Servs. Auto. Assn.</u>, 225 Cal.
App. 3d 464, 467 (Ct. App. 1990).

        This court need not determine whether the word
"deterioration" in the policy applies only to worsening caused
by natural and/or slow-moving agents inasmuch as it appears
undisputed that under defendants' causation theory, the weld was
corroded by long-term and natural agents, here long-term
exposure to atmospheric moisture and wet coal.  It suffices that
either narrower interpretation would avoid surplusage, as the
common meaning of corrosion does not apply only to natural
and/or slow-moving agents.  Moreover, where corrosion is defined
as a "chemical or electrochemical reaction," deterioration can
be present without corrosion inasmuch as it may occur by
physical processes, such as friction.

        Accordingly, the Wear and Tear Exclusion unambiguously
covers defendants' theory of causation, thus absolving defendant
of the obligation to pay under the policy.  Because the accuracy
of defendants' causation theory involves a matter of disputed
material fact, summary judgment for either party is denied as to
this defense, as well.

        The policy also does not permit recovery where loss or
damage is "caused by or resulting from inherent vice or latent

defect." See Policy at FIC_008606.  A latent defect is "[a] defect not manifest, but hidden or concealed, and not visible or apparent; a defect hidden from knowledge as well as from sight; specifically, a defect which reasonably careful inspection will not reveal; one which could not have been discovered by inspection." TravCo Ins. Co., 736 S.E.2d at 326.  An inherent vice has been defined by courts as "any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time." GTE Corp. v. Allendale Mutual Ins. Co., 372 F.3d 598, 611 (3d Cir. 2004) (quoting Port of Seattle v. Lexington Ins. Co., 48 P.3d 334, 337 (Wash. 2002)).  Alternatively, it has been defined as a cause of loss that "does not relate to an extraneous cause but to a loss entirely from internal decomposition or some quality which brings about its own injury or destruction.  The vice must be inherent in the property for which recovery is sought." Id.

If WJE is correct that the selection of a weld and connecting plates made of ordinary steel, rather than stainless steel, and the failure to use stainless steel to protect the weld, left the weld susceptible to moisture and corrosion that caused the loss, see WJE-1 at 6, then that susceptibility to corrosion may itself be an inherent vice of the weld, as it would constitute the "inherent nature of the commodity which

will cause it to deteriorate with a lapse of time." GTE Corp.,
372 F.3d at 611.  Thus, plaintiff's argument that defendants
have concluded that corrosion was the sole cause of loss is not
a basis for summary judgment on the Inherent Vice / Latent
Defect Exclusion.

Whether the weld's susceptibility to rust was the
cause of the collapse is a material, factual dispute.  Mamone
noted in his deposition, that he based his conclusions on a
"pristine weld."  Mamone Dep. 114.  In other words, while he did
not reach a conclusion regarding the actual state of the weld,
he opined that the failure event would have occurred regardless
of the weld quality at the time of the collapse under his
theory.  Id.  If the failure would have occurred even with a
pristine weld, then the fact that the weld was corroded, and
susceptible to corrosion, was not the cause of failure.  If the
factfinder were to find Mamone's causation theory to be more
persuasive than that of WJE, then the factfinder would likewise
conclude that a defective weld did not cause the loss and would
not implicate the latent defect or inherent vice exclusions.

Defendants also argue that Mamone's testimony
conclusively establishes that the Inherent Vice / Latent Defect
Exclusion applies based on an answer he gave in his deposition.
See Mamone Dep. 133 ("Q: Was the weld defective in any way? A:

36

What do you mean by defective? I mean it failed, it must have
been defective.").  Defendants' argument contradicts Mamone's
analysis and seeks to capitalize on a single ambiguous answer in
his deposition testimony.  Given Mamone's theory is that even a
pristine weld would have failed under his theory of arch
collapse, the line of testimony on which defendants rely cannot
be understood to go as far as they contend.

     Moreover, the word "defective" was not defined by
defendants' counsel in the question posed to Mamone, who asked
"What do you mean by defective?"  Thus, the word may have meant
something different to Mamone personally than what is meant by
"Defect" in the policy.  Id.  Mamone went on to supply a broad
definition of defectiveness, which would essentially cover any
weld which fails, in response to counsel's question.  Id. ("A:
What do you mean by defective?  I mean it failed, it must have
been defective.").  No case on which defendants rely endorses
such a broad notion of what constitutes a latent defect or
inherent vice in an insurance policy, i.e., anything that fails
is defective, and such a definition would appear to be untenable
in the context of an all-risk insurance policy.  It is worth
noting as well that Mamone expressly testified that he did not
believe that a design defect caused the failure event.  Id. at
133.  Accordingly, Mamone's testimony does not establish the

applicability of the Inherent Vice / Latent Defect Exclusion. Accordingly, whether that Exclusion applies remains an issue of material fact and summary judgment cannot be granted on the Exclusion.

Plaintiff also asserts that it is entitled to coverage based on the Mechanical Breakdown Exclusion of the policy. Defendants have not asserted the Mechanical Breakdown Exclusion as a basis to deny coverage under the policy's coverage clause, either in their answers or in their summary judgment memorandum, though they do argue that the Mechanical Breakdown Exclusion does not afford plaintiff coverage.  See ECF Nos. 14, 155.  The Mechanical Breakdown Exclusion states that "[t]his insurance does not apply to loss or damage caused by or resulting from mechanical breakdown."  Policy at FIC_008759.  Specifically exempted from the exclusion is an "abrupt and accidental breakdown of mechanical or electrical system or apparatus which causes direct physical loss or damage to all or part of that mechanical or electrical system or apparatus provided the direct physical loss or damage becomes manifest at the time of the breakdown that caused it."  Id.  On its face, this Exclusion is not an affirmative grant of coverage, even if the loss here falls within the Exclusion's exception for "abrupt and accidental breakdown," as plaintiff argues.

38

Plaintiff asserts, without evidence, that it paid a separate surcharge for coverage for "accidental breakdowns" to mechanical or electrical systems and that this is why the policy includes the exclusion for losses resulting from mechanical breakdown. It also asserts, without evidence, that defendants market the policy as covering losses for abrupt and accidental mechanical breakdowns. Plaintiff fails to cite a provision of the policy that states or implies that coverage for accidental breakdown is somehow broader than the coverage clause of the all-risk policy or that the other exclusions that apply under defendants' causation theory do not apply to an abrupt or accidental mechanical breakdown. Without policy language to analyze or evidence external to the contract, the court of course cannot credit plaintiff's argument expanding coverage beyond what falls under the general coverage clause. Inasmuch as defendants do not seek to assert the Mechanical Breakdown Exclusion and the exclusion does not affirmatively grant any additional coverage, the court denies plaintiff's motion for summary judgment on the basis of the Mechanical Breakdown Exclusion.[4]

---

[4] The court does not reach defendants' argument that the "abrupt and accidental breakdown" exception to the exclusion does not apply.

Defendants in their answers to the amended complaint raise three additional policy exclusions as affirmative defenses: the Acts or Decisions Exclusion, the Business Errors Exclusion (both listed in the Second Affirmative Defense), and the Planning Exclusion (Fourth Affirmative Defense).  Plaintiff argues for summary judgment on these defenses inasmuch as the application of these defenses is inconsistent with defendants' theory of causation that corrosion was the sole cause of the failure.

Defendants do not argue that their causation theory implicates any of these three exclusions, but instead argue that summary judgment is not appropriate inasmuch as these exclusions apply to theories that plaintiff has floated at times during litigation.  For this contention, defendants cite only to deposition testimony by Kurt Chapin, defendant Ace's Chief Technology Officer, who stated that plaintiff had at some point asserted an issue with the design of the fillet weld that held the hopper in place, though he stated that the nature of the issue was unclear to him and that plaintiff did not support that position with an engineering report.  Chapin Dep. 17-18, ECF No. 173-14.

This testimony does not establish that under plaintiff's causation theory any of the above exclusions apply.

40

Defendants bear the burden of proof at trial of establishing that any of their affirmative defenses are consistent with one of the two causation theories for which there is evidence.  In failing to present relevant evidence or argument as to how plaintiff's theory implicates these policy exclusions, defendants have abandoned these affirmative defenses.  <u>See Lipton v. County of Orange, N.Y.</u>, 315 F.Supp.2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed"). Thus, summary judgment in plaintiff's favor is appropriate as to defendants' Second Affirmative Defense (the Acts or Decisions Exclusion and the Business Errors Exclusion) and Fourth Affirmative Defense (the Planning Exclusion).  If plaintiff at trial attempts to state a claim that is excluded by any of these three exclusions, the court may allow defendants to resurrect them.

Defendants' answers raise several generalized affirmative defenses not based on any specific provision of the policy including:

- that plaintiff has failed to state a claim upon which relief can be granted (First),

- that plaintiff has failed to show, and cannot carry its burden of demonstrating, that any direct physical loss or damage it has alleged, and any costs or other amounts it alleges it incurred, were caused by or resulted from a peril not otherwise excluded (Seventh),

- that plaintiff has failed to show, and cannot carry its burden of demonstrating, that any business income loss and any extra expense it has allegedly incurred or experienced were caused by or resulted from direct physical loss or damage by a covered peril to property (Eighth),

- that plaintiff's "claims are barred, in whole or in part, to the extent that the terms, conditions, limitations, and provisions of the Federal Policy limit, exclude, or preclude coverage for the Loss and/or its Claim" (Eleventh),

- that defendants "reserve[] the right to assert any and all policy defenses provided for in the contract of insurance," (Twelfth),

- that defendants acted in conformity with law (Thirteenth),

- that defendants acted in conformity with the contractual obligation to its insured (Fourteenth), and

- that defendants reserve the right to raise additional affirmative defenses (Fifteenth).

Plaintiff moves for summary judgment on these defenses because defendants have not identified any basis to deny coverage based on these defenses and the time to raise additional defenses has passed. Defendants do not respond to these arguments. To the extent these affirmative defenses reserve the right to assert additional defenses, they are not necessary under Rule 15. E.E.O.C. v. Timeless Investments, Inc., 734 F. Supp. 2d 1035, 1055 (E.D. Cal. 2010) ("Rule 15 does not require a defendant to 'expressly reserve' unnamed affirmative defenses in its answer") (citation omitted). The reservation of rights language is therefore immaterial. See Johnson v. Providence Health & Services, 2018 WL 2289331 at *3 (W.D. Wash. May 18, 2018). Moreover, to the extent these defenses assert that defendants acted in conformity with the contract provisions and with applicable law, or that plaintiff has not met its burdens of proof, they are not asserting affirmative defenses, but instead echoing their arguments on the merits of breach of contract and the UTPA claim. See Adams v. Jumpstart Wireless Corp., 294 F.R.D. 668, 671 (S.D. Fla. 2013) ("An affirmative defense is one that admits to the complaint, but avoids liability, wholly or partly, by new allegations of excuse, justification, or other negating matters"). As such, those defenses are redundant and immaterial.

43

The court accordingly finds that it is appropriate to strike the First, Seventh, Eighth, Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth defenses sua sponte.  <u>See</u> Fed. R. Civ. P. 12(f)(1) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act: (1) on its own").  Nothing in this finding should be read to preclude defendants from asserting new defenses in accordance with the appropriate procedure for amending pleadings under Rule 15, nor should it be read as a conclusion as to the merits of any affirmative defenses actually asserted by defendants.  Thus, plaintiff's motion for summary judgment as to these defenses is moot.

In their Ninth Affirmative Defense, defendants state that plaintiff's "claims are barred, in whole or in part, to the extent [it] seeks payment in excess of any applicable limit of insurance."  ECF No. 30.  Plaintiff argues in conclusory fashion that it is not seeking payment in excess of the limit on its contract claim and is thus entitled to summary judgment.  Given the lack of development of the argument, there is no basis for the court to grant summary judgment as to the Ninth Affirmative Defense.

Defendants' Tenth Affirmative Defense states that plaintiff's claims are precluded to the extent that plaintiff failed "to comply with the provisions of the Federal Policy entitled: Compliance By Insured, Inspection and Surveys, and/or Insured's Duties in The Event of Loss or Damage."  ECF No. 30. Plaintiff argues that defendants cannot demonstrate that plaintiff failed to comply with the policy and that the only evidence which relates to this claim is that plaintiff did not preserve the majority of the silo for inspection.  Plaintiff argues that, while it did destroy the hopper, this could not amount to a failure to comply with inspection inasmuch as it never received instructions from defendants' inspectors prior to destruction despite the inspectors being aware of the ongoing demolition.

Defendants do not respond to this argument in their response brief, nor do they offer another basis to support the affirmative defense.  Defendants do assert in their memorandum in support of summary judgment that "[n]otwithstanding its contractual obligation to preserve the damaged property for inspection, which Mr. Gibson had expressly discussed at the November 8 Lexington meeting, plaintiff disposed of most of Silo No. 1's parts and remnants following the demolition process." ECF No. 155 at ¶ 32.  The only citation for this claim is a

45

portion of Zaluski's deposition testimony in which he admits
that he received a November 16, 2018 email from Gibson,
plaintiff's insurance broker, informing him that "disposing,
moving, et cetera, of any of the critical components should be
delayed until [defendants' engineers] are able to inspect."
Zaluski Dep. 187-88.  Zaluski goes on to explain that he
believed that the focus of defendants' engineers, based on the
November 14 meeting, had been the metal hopper and nothing else,
and that he thought that was the critical component which was
referenced in the email.  Id. at 189.

        Defendants have not identified what contractual
obligation was violated by plaintiff in destroying the remainder
of the silo, nor have they demonstrated that plaintiff violated
such a contractual obligation.  The only duties in relation to
an investigation that the court has identified in the policy is
the provision on "Duties ln The Event Of Occurrence, Offense,
Claim Or Suit," which states in a general fashion that the
"insured must cooperate with us and other insurers in the
investigation or settlement of the claim."  Policy at
FIC_008807-08.  Defendants fail to respond to plaintiff's
argument that its destruction of parts of the silo was not a
violation of the policy inasmuch as it did not receive
instructions to not destroy the silo.  Defendants' failure to

respond to this argument or to offer a theory by which
plaintiff's destruction of the silo limits defendants' liability
constitutes an abandonment of this argument.  See Lipton, 315
F.Supp.2d at 446.  Thus, summary judgment as to defendants'
Tenth Affirmative Defense is granted.

Coverage Clause

        Plaintiff further argues in its summary judgment
memorandum that, even if the collapse had been caused by
corrosion, the damage subsequent to the collapse - that is,
damage to the silo itself and to the conveyor belt on which it
landed - should not be excluded because damage caused by a
falling object does not fall within any of the exclusions.  For
this proposition, plaintiff notes that the general coverage
provision states that plaintiff is entitled to coverage for any
"direct physical loss or damage" to a "building" or "personal
property" that is "caused by or resulting from a peril not
otherwise excluded" from the policy.  Policy at FIC_008593
(emphasis added).  Plaintiff argues that under general
principles of contract interpretation, "caused by" and
"resulting from" should be understood to cover different
concepts to avoid surplusage.  Plaintiff argues therefore that
the best understanding of these phrases is that "caused by"
refers to a direct cause, or what it calls the link closest to

47

the damage in the chain of causation, while "resulting from" refers to more remote causes up the chain.

In TMW Enterprises, Inc. v. Federal Ins. Co., the Sixth Circuit declined to adopt the reasoning plaintiff urges to the same "caused by or resulting from" phrase in a provision granting coverage.  619 F.3d 574 (6th Cir. 2010).  The court reasoned that such an understanding would effectively read the exclusions out of the policy altogether, as long as the final causative agent of the damage was not expressly included in the list of excluded perils.  Id. at 576.  The Sixth Circuit offered the example of a roof with a defective design, which allows water to leak into a building and damage the floors.  Id. at 577.  Plaintiff's interpretation would say that this would result in coverage since the water was the direct cause of the damage, even if there were a defective design exclusion.  "To say that the risk was not covered because other elements or natural forces were the last causative agents of the damage, though to be sure utterly foreseeable causes of the damages, is to eliminate the exclusion."  Id. at 577.  Beyond absurd results, plaintiff's interpretation is at odds with the nature of an all-risk policy, which "basically covers everything unless specifically excluded."  Id. at 576.

The Sixth Circuit likewise declined to place so substantial a weight on avoiding surplusage in interpreting the clause.  The court held that "[t]he canon is one among many tools for dealing with ambiguity, not a tool for creating ambiguity in the first place."  Id. (emphasis in original). While it is generally preferable to interpret contracts to minimize surplusage, "surplusage alone does not make an insurance policy ambiguous."  Id. at 578 (quoting Michigan Twp. Participating Plan v. Pavolich, 591 N.W.2d 325, 330 (Mich. 1998)).  As the court noted, contract drafting frequently involves a "belt and suspenders" approach.  Id.

In essence, the peril of the falling hopper is not conceptually distinct from the corrosion that precipitated the fall.  In Finn v. Continental Ins. Co., 218 Cal.App.3d 69, 267 Cal.Rptr. 22, 24 (1990), where water leaking from a broken sewer pipe "for months or years" had damaged the foundation of the plaintiff's house and the insured's "broad peril policy" excluded damages from "continuous or repeated seepage or leakage of water," the court held that "leakage and broken pipes are not two distinct or separate perils.... Leakage or seepage cannot occur without a rupture or incomplete joining of the pipes. This case involved not multiple causes but only one, a leaking pipe."  Id.

49

If the hopper detached and fell because of corrosion, then the corrosion would still have caused the resulting damage, even if the ultimate agent of that damage is through the falling hopper. Thus, if defendants' corrosion-based theory of causation is proven correct at trial, plaintiff cannot somehow recover for losses resulting from a falling object, where that object is falling immediately following and because of an excluded peril, merely by recasting the cause of loss under another name. No other peril appears to have operated between the breaking of the weld and the hopper's falling about 20 feet onto the conveyor belt in a split-second. Therefore, summary judgment cannot be granted in plaintiff's favor on its anti-domino theory.

## Damages

Defendants move for partial summary judgment as to damages arising under the "Business Income and Extra Expense" provision of the policy.[5] Business interruption coverage is designed to put an insured in the place it would have been had no business interruption occurred. <u>Prudential LMI Comm. v.</u>

---

[5] Defendants do not seek summary judgment as to plaintiff's request for damages arising from silo demolition and the cost of replacing the conveyor, inasmuch as these damages could be established by lay testimony and are subject to a dispute of material fact. Defs.' Summ. J. Mem. 29.

Colleton Enter., Inc., 976 F.2d 727, *2-3 (4th Cir. 1992)
(Table).  The policy provides that the insurer "will pay for the
actual: business income loss you incur due to the actual
impairment of your operations; and extra expense you incur due
to the actual or potential impairment of your operations, during
the period of restoration."  Policy at FIC_008623.

        In establishing its damage calculations, plaintiff
relies heavily on the analysis performed by its Chief Accounting
Officer, John Marcum, who supervised the compilation of data and
computation of losses plaintiff incurred as a result of the
failure event.  Marcum Decl., ECF No. 171-1.  Marcum supported
those calculations by collecting supporting documentation
including invoices, timesheets, statements of profit and loss,
and contracts.  Id.  Plaintiff's accounting experts, Lane Ellis,
Jr. and Patrick M. Smith, authored a report in which they opined
that the methodology and conclusions reached by Marcum were
reasonable.  Smith Report, ECF No. 172-15.

        Defendants assert that there is no admissible evidence
supporting the claim to either business income or extra expenses
coverage.  They contend that Marcum cannot testify as to his
opinions regarding losses because he was not designated as an
expert under Rule 26(a)(2)(A) and the applicable time for
disclosure has elapsed.  Plaintiff contends that Marcum is

available and competent to testify as a lay witness.  He was
disclosed in the plaintiff's Rule 26(a)(1) disclosures, which
noted that he had relevant knowledge regarding plaintiff's
damages and the accounting practices followed to collect damages
documentation.  Marcum Decl. ¶ 8.  Defendants did not depose
Marcum in this matter.  <u>Id.</u>

        Marcum's proposed testimony as to the collection and
calculation of internal data to arrive at a damages sum appears
to be appropriate lay testimony.  As the advisory committee
notes to Rule 701 recognize, "most courts have permitted the
owner or officer of a business to testify to the value or
projected profits of the business, without the necessity of
qualifying the witness as an accountant, appraiser, or similar
expert."  Fed. R. Evid. 701 advisory committee's note to 2000
amendment (citing <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d
1153 (3d Cir.1993)); <u>see also</u> <u>Lord & Taylor, LLC v. White Flint,
L.P.</u>, 849 F.3d 567, 575-76, (4th Cir. 2017) (employees may
"opine on accounting projections under Rule 701, so long as
their opinions are based on their first-hand experience on the
job").  Courts permit such testimony by officers or managers of
a company, which is outside the ordinary bounds of personal
knowledge based upon physical perception, "because of the
particularized knowledge of a witness by virtue of his personal

experience in a field." <u>King v. Rumsfeld</u>, 328 F.3d 145, 158 (4th Cir. 2003) (Gregory, J., concurring in part).  Marcum appears competent to testify as to the damages information he collected and computed, and for the purposes of summary judgment, the court considers Marcum's proposed testimony as explained in his declaration.

Moreover, while Smith and Ellis did not form an opinion as to the appropriate damage calculation, Smith Dep. 82-83, they did form an opinion that the methodology and conclusions reached by Marcum were reasonable and appropriate. Thus, their opinions are considered as well for the purposes of summary judgment as to damages.

The policy defines "business income" as:

A. net profit or loss, including rental income from
tenants and net sales value of production, that would
have been earned or incurred before income taxes;
B. your continuing normal:
    1. operating and
    2. payroll, expenses;
C. charges you incur which are the legal obligation of
your tenant which would otherwise be your obligations;
and
D. the cost you are required to pay to rent temporary
premises when that portion of the premises shown in
the Declarations occupied by you is untenable, not to
exceed the fair rental value of such untenable portion
of the building you occupy.

Business income does not mean bank interest or
investment income.

Policy at FIC_008695.

Under the "Loss Determination" provision, the policy provides that:

> The amount of business income loss will be determined based on the:
> - net income of your business before the direct physical loss or damage occurred;
> - the likely net income of your business if no loss or damage occurred, but not including any business income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the covered loss on customers or on other businesses; and
> - your continuing operating expenses, including your continuing normal payroll expenses, necessary to resume operations with the same quality of service that existed just before the direct physical loss or damage.

Policy at FIC_008631.  The Loss Determination provision thus establishes that to recover, an insured must prove: (1) the net income of plaintiff's business prior to the loss or damage, (2) the likely net income had the failure event not occurred, and (3) the insured's continuing normal payroll expenses necessary to resume operations to pre-event levels.

Neither the Smith report nor the Marcum declaration evidence the net income of plaintiff's business prior to the loss.  Nor does plaintiff point to any evidence before the court that would indicate it would be able to prove plaintiff's pre-loss net income.  Likewise, plaintiff does not identify or evidence a likely net income had the failure event not occurred.  Neither Marcum nor Smith opine as to what that amount would be.

Instead, plaintiff identifies four categories of loss which one could categorize, though plaintiff does not do so explicitly, as falling within the business income provision: (1) "Continuing payroll for deep mine labor for lost shifts," (2) "Contractual penalties for Kinder Morgan Shortfall for Pier IX," (3) "Lost business income for missed shipments to Thyssen," and (4) "Lost business income for lost production."  See Smith Report at 3.

        While plaintiff has failed to comply strictly with the formula specified in the policy for determination of business income loss, that loss may be proved to the extent of irredeemable losses experienced on particular contracts (Kinder Morgan or Thyssen) and evidence of other similar losses during the restoration period, which may be as long as November 2018 to June 2019, together with "continuing operating expenses."

        Extra expenses are defined by the policy to be those "necessary expenses [the insured] incur[s]:"

    A. in an attempt to continue operations, over and
    above the expenses [the insured] would have normally
    incurred; and
    B. to repair or replace any property, or to research
    or restore the lost information or damaged valuable
    papers, records and media, if such action will reduce
    any loss [the insurer] would pay under this insurance

Policy at FIC_008698.  Under the Loss Determination provision, the amount of extra expenses is to be determined by "the necessary expenses that: exceed [the insured's] normal operating

expenses that would have been incurred by operations during the period of restoration, if no physical loss or damage had occurred; and reduce the business income loss that otherwise would have been incurred."  Policy at FIC_008631.

Plaintiff calculated four categories of economic losses that could be categorized as within the Extra Expenses coverage: (1) "silo demolition and removal," (2) "extra expense incurred to continue operations," (3) "construction of bypass belt necessary to continue operations," and (4) interest paid on "revolver draws."  Smith Report at 3.  Defendants do not seek partial summary judgment as to the losses sustained from silo demolition and removal or from the construction of the bypass belt. Defs.' Summ. J. Mem. 29 n.4.  The extra expenses incurred to continue operations include nine components: coal haulage, coal loading, stockpile management & construction, environmental / permitting, road cleaning and maintenance, safety training & violations, over / under weight penalty charges by CSX, internal equipment usage costs, and loading, sampling & analysis.  Smith Report 7.  The interest paid on revolver draws refers to the fact that plaintiff had less cashflow and thus had to borrow money on a revolving line of credit to fund ongoing operations. Id. at 10-11.  Accordingly, it had to pay a higher amount of

interest than it otherwise would have in order to continue its
operations.

Marcum's declaration provides sufficient information
to conclude that his testimony at trial could establish that the
specific categories under "extra expense incurred to continue
operations" and the interest on the revolver draws were expenses
that were both necessary and exceeded plaintiff's normal
operating expenses.  For example, Marcum explains that the
Environmental / Permitting line item reflects reclamation work
and maintenance work that was "necessary due to the silo
failure."  Marcum Decl. ¶ 26(c).  Whether the extra expenses
were in fact in excess of normal expenses and whether they were
necessary remains a material issue of fact.

Likewise, whether the expenses fell within the "period
of restoration," as defined by the policy is an issue of
material fact.  Plaintiff contends that the period of
restoration ran from the date of the failure event until June
2019, when it believes that operations were restored to the
level which would generate the business income that it
experienced prior to the failure event.  Marcum Dec. at ¶ 73.
Defendants' expert, Lewis, opines that "operations could have
been restored with reasonable speed and appropriate diligence to
their pre-loss condition in December of 2018, and that

operations were, in fact, substantially or completely restored
to their pre-loss condition by the end of December of 2018 at
the latest." The replacement conveyor system was scheduled to
be completed in December 2018 but was not in fact completed
until February 28, 2019. Defs.' Summ. J. Mem. ¶ 59, Pl.'s Resp.
¶ 59. Full operations remained elusive until June 2019, when
support structures were completed on the other two silos. Id.
Defendants argue that the delay in completing the conveyor belt
and the time it took to complete the upgrade work of Silos 2 and
3 should not be included within the period of restoration.

The period of restoration began to run with the
failure event. See Policy at FIC_008722 (the period being
"immediately after the time of direct physical loss or damage by
a covered peril to property"). The "[p]eriod of restoration
will continue until [the insured's] operations are restored,
with reasonable speed, to the level which would generate the
business income amount that would have existed if no direct
physical loss or damage occurred." Policy at FIC_008723. This
period includes "the time required to:

        A. repair or replace the property; or
        B. repair or replace the property to comply with the
        minimum standards of any enforceable
        ordinance or law that:
                1. regulates the repair or replacement of any
                property;
                2. requires the tearing down of parts of any
                property not damaged by a covered peril;

and
3. is in force prior to the date of the direct
physical loss or damage

**Id.**  In clear terms, the policy measures the period of restoration according to when operations are restored, rather than the time at which the damaged property is replaced or repaired, as long as the speed at which such restoration occurs is reasonable.  At a minimum, the period of restoration includes the time it takes to repair or replace the property.  Of particular importance to the issues raised by defendants, the policy defines the silos together, rather than individually, as a single building.  Policy at FIC_008579 (describing Elk Creek Raw Silos as Premises #4, Building 1).

Whether the time it took for plaintiff to modify the other two silos caused the period to reach full restoration of operations to exceed that which was reasonable is a matter of material and disputed fact.  Plaintiff's position that the period of time was reasonable may be supported by circumstantial evidence, given the potentially dangerous condition that the remaining silos were in.  According to plaintiff's expert on mining engineering Dennis Kostic, it was "common sense" for plaintiff to address a risk of collapse of the other two silos, which only revealed itself after the failure event in Silo No. 1, as a matter of worker safety.  Kostic Dep. 55, 60.  Likewise,

a factfinder could find it unreasonable to have delayed
production to provide the additional support to the remaining
silos before resuming operations.  Accordingly, whether the
extra expenses identified by plaintiff meet the requirements of
the policy, namely, whether they were (1) necessary, (2) extra,
and (3) during the period of restoration, remains a material
issue of fact and summary judgment for defendants is denied as
to those expenses.

Lastly, plaintiff seeks damages related to the
replacement of Silo 1.  It is undisputed that plaintiff has not
replaced Silo 1.  Defs.' Summ. Mem. ¶ 57, Pl.'s Resp. ¶ 57.
Consequently, the plaintiff can only recover the Actual Cash
Value ("ACV") of the property.  Policy at FIC_008612.  The
policy computes ACV as the cost to repair or replace the
property at the time of loss less physical deterioration,
physical depreciation, obsolescence, and depletion.  Policy at
FIC_008613.

Though the report by Smith and Ellis notes that
plaintiff has calculated a sum for "cost to replace silo," they
"specifically did not analyze the Plaintiff's damage relating to
the item 'Cost to replace silo.'"  Smith Report 2.  Nor does
Marcum's declaration explain how the sum identified by plaintiff
as to the cost of replacement is reached.  Plaintiff provides no

evidence of either cost to replace or the amount of depreciation to be applied.  In sum, as defendants observe and plaintiff does not rebut, plaintiff has not identified any evidence to support an ACV of Silo 1.  Partial summary judgment is granted as to damages arising out of replacement costs for Silo 1.

Breach of Duty of Good Faith and Fair Dealing

Plaintiff alleges in Count III of its amended complaint "Defendant's Breach of Duty of Good Faith and Fair Dealing," based on allegedly erroneous and unreasonable coverage positions taken in its determination that the failure event was not covered.  ECF No. 14.  Defendants argue that they are entitled to summary judgment on Count III because there is no independent cause of action for a breach of the duty of good faith and fair dealing under West Virginia law.  Defendants note as well that Count III is dependent on plaintiff's prevailing under its Count II breach of contract claim.

To the extent Count III alleges facts entitling plaintiff to attorneys' fees and punitive damages, it is treated as a single cause of action with Count II.[6]  See Mid-State

---

[6] The court notes that while plaintiff argues in its summary judgment memorandum that it is also entitled to damages associated with aggravation and inconvenience, these damages are not pled in the operative complaint.  See ECF No. 14.

Automotive, Inc. v. Harco National Ins. Co., 2019 WL 6130457, at
*3 (S.D.W. Va. Nov. 18, 2019) (treating Count I Breach of
Contract and Count III Breach of the Implied Covenant of Good
Faith and Fair Dealing as a single breach of contract claim);
see also Mountaineer Prop. Co., LLC v. Assurance Co. of Am.,
2016 WL 5107026, at *3 (N.D.W. Va. Sept. 20, 2016) (construing
"Count II Breach of Contract and Count III Breach of Implied
Covenant of Good Faith and Fair Dealing, as a single breach of
contract claim").

        Inasmuch as the court has found that summary judgment
against plaintiff on the breach of contract claim is
unwarranted, summary judgment is not warranted as to any Count
II/III claim for Hayseeds damages.  See Hayseeds, Inc. v. State
Farm Fire & Cas., 352 S.E.2d 73, 80 (W. Va. 1986) ("[W]hen a
policyholder substantially prevails in a property damage suit
against an insurer, the policyholder is entitled to damages for
net economic loss caused by the delay in settlement, as well as
an award for aggravation and inconvenience").  Because the
underlying contract claim remains a matter of disputed material
fact, plaintiff may continue in its effort to seek reasonable
attorneys' fees under Hayseeds, should it prevail.

## Unfair Trade Practices Act and Punitive Damages

Plaintiff alleges in Count IV of its amended complaint that defendants violated West Virginia's Unfair Trade Practices Act ("UTPA"), codified at W.Va. Code § 33-11-4(9).  The statute prohibits insurers from engaging in a "general business practice" of unfair claim settlement.  W. Va. Code § 33-11-4(9). In order to establish a violation of the UTPA based on an insurer's handling of a single claim,

> the evidence should establish that the conduct in question constitutes more than a single violation of W. Va. Code § 33-11-4(9), that the violations arise from separate, discrete acts or omissions in the claim settlement, and that they arise from a habit, custom, usage, or business policy of the insurer, so that, viewing the conduct as a whole, the finder of fact is able to conclude that the practice or practices are sufficiently pervasive or sufficiently sanctioned by the insurance company that the conduct can be considered a "general business practice" and can be distinguished by fair minds from an isolated event.

Dodrill v. Nationwide Mut. Ins. Co., 491 S.E.2d 1, 13 (W. Va. 1996).  Accordingly, a valid UTPA claim against an insurer based on a single claim requires showing that the "insurer (1) violated the UTPA in the handling of the claimant's claim and (2) that the insurer committed violations of the UTPA with such frequency as to indicate a general business practice."  Holloman v. Nationwide Mut. Ins. Co., 617 S.E.2d 816, 823 (W. Va. 2005). The UTPA lists fifteen general business practices that amount to

unfair claim settlement practices.  W. Va. Code § 33-11-4(9)(a)-(o).

Defendants also seek summary judgment against plaintiff's claim for punitive damages.  An insured cannot seek punitive damages under West Virginia law for a violation of the UTPA unless it "can establish a high threshold of actual malice in the settlement process."  Hayseeds, Inc. v. State Farm Fire & Casualty, 352 S.E.2d 73, 80-81 (W.Va. 1986).  Actual malice here means "that the company actually knew that the policyholder's claim was proper, but willfully, maliciously and intentionally denied the claim."  Id.  The West Virginia Supreme Court of Appeals explained that it "intend[ed] this to be a bright line standard, highly susceptible to summary judgment for the defendant."  Id.  "Unless the policyholder is able to introduce evidence of intentional injury—not negligence, lack of judgment, incompetence, or bureaucratic confusion—the issue of punitive damages should not be submitted to the jury."  Id.

Plaintiff presents four instances it contends constitutes unfair settlement practices: (1) the allegedly intentional alterations of a claims file note regarding the March 2019 meeting between the parties, (2) the failure to document the claim file regarding that meeting's subject matter, (3) defendants' failure to take notes documenting their analysis

64

as to the so-called Mechanical Breakdown Exclusion, and (4) failure to document complaints made against them.  Plaintiff does not inform the court what the underlying business practice is for which these supposed violations evidence a habit, custom, usage, or business policy.  Nor does plaintiff explain to the court how these failures of the insurer violate the UTPA.

Additionally, plaintiff claims that defendants' "repeated bad faith and malicious conduct" also constitutes UTPA violations.  Plaintiff raises four categories of malicious conduct: (1) issues relating to the hiring of WJE as an investigator of the failure event, (2) failure to investigate several pathways for coverage for plaintiff, (3) intentional disregard of the Copper River litigation, and (4) general misconduct in the course of litigating this case.

As to the unfair settlement practices, plaintiff claims that the alteration to an email summarizing a March 2019 meeting between representatives of plaintiff and defendants, the failure to record the meeting in the claim file, and the failure to make documentation of the Mechanical Breakdown Exclusion constitute violations of § 114-4-3 of the West Virginia Code of State Rules.  That regulation is promulgated by the Insurance commissioner, in order to "define certain practices in [West Virginia] which constitute unfair ... practices ... and methods

of settlements" of insurance claims.  W. Va. Code R. § 114-14-1.1(a); W. Va. Code §§ 33-11-4a(h) (authorizing insurance commissioner to establish standards of conduct under UTPA).

The regulation provides that an insurer's claim "files shall contain all notes and work papers pertaining to the claim in such detail that pertinent events and the dates of such events can be reconstructed."  W. Va. Code St. R. § 114-14-3. It further provides that "[a]ll communications and transactions emanating from or received by the insurer shall be dated by the insurer.  A notation of the substance and date of all oral communications shall be contained in the claim file."  Id.

The first claimed violation is based on a draft e-mail sent internally between employees of defendants in an attempt to summarize a meeting on March 28, 2019 involving plaintiff and defendants, at which the parties discussed the causation issue. The draft summarized what occurred at that meeting and indicated that "new information was discussed" at the meeting.  When the e-mail was sent from Ace's insurance adjuster, Frank Gonsalves to Zaluski, it indicated that "information was exchanged," without the word "new."  The second claimed violation is based on a draft note by Gonsalves, which indicated that during the March 2019 meeting plaintiff had "provided their thoughts as to the cause of loss," but that statement was ultimately removed

66

from the note before being put into the claim file.  ECF No.
171-32.  However, the ensuing paragraph of that same note goes
on to explain what plaintiff's thoughts were as to the cause of
loss.

        The edits made to these documents are of an
exceedingly minor nature and no reasonable factfinder could find
that these edits modified the substance of what is described in
the documents.  Plaintiff attempts no showing that the notes and
communications contained in the case file fall short of the
regulation's command that notes be "in such detail that
pertinent events and the dates of such events can be
reconstructed."

        Plaintiff alleges that defendants failed to make any
notes relating to its coverage regarding the Mechanical
Breakdown Exclusion despite the fact that defendants had gone
through an internal analysis of the applicability.  In
conclusory fashion, plaintiff argues this violates the same
regulation.  It does not appear to the court that defendants had
a duty under the regulation to document their analysis as to the
inapplicability of each coverage provision in the contract,
including exclusions which defendants have not relied upon.
Inasmuch as plaintiff has not shown how the absence of such

analysis implicates the reconstruction of such events, they have not demonstrated a violation of the regulation.

Plaintiff contends that defendants have failed to document complaints made against them to the West Virginia Department of Insurance ("WVDOI"), in violation of W. Va. Code § 33-1-4(10).  Kurt Chapin declared on behalf of defendants that defendants had no record of complaints against them to the WVDOI because there were no such complaints.  Chapin Decl. at ¶ 20.  Plaintiff does not support its contention with any evidence or even allege that there were complaints to keep records of.  Accordingly, failure to document complaints to the WVDOI cannot form the basis for a UTPA claim.

As to the allegation of bad faith and malicious conduct, plaintiff contends that numerous issues with defendants' engineers, WJE, constitute both evidence of a UTPA claim and malice.  It argues that defendants failed to evaluate the qualifications of WJE before bringing them in to do investigatory work, that the employment of WJE raised issues of bias because WJE performed many other investigations for defendants and advertised its relationship with defendants, that the senior principal at WJE did not adequately investigate the causes of the collapse, and that the claim was denied before WJE rendered a report.  Plaintiff fails to explain what provision of

the UTPA these alleged violations transgress or how this
evidences malice under West Virginia law.

Plaintiff also contends in a general manner that
"Defendants failed to investigate multiple pathways to
coverage," citing portions of its summary judgment motion
dealing with the coverage clause, the Planning, Design, Material
or Maintenance Exclusion, and the Mechanical Breakdown
Exclusion.  For reasons discussed infra, the latter two
provisions were exclusions to the policy and not pathways to
coverage for plaintiff and plaintiff's argument as to coverage
under the coverage clause is without merit.  Plaintiff does not
show why defendants were under a duty under the UTPA to
investigate the identified exclusions or how the supposed
failure to investigate them amounted to a violation of the UTPA.
Nor do they show how this conduct constitutes evidence of
malice.

Finally, plaintiff contends that defendants' allegedly
"intentional disregard" of Copper River demonstrates malice
given the overlap in personnel handling the two claims.
Plaintiff contends that Ace's Vice President, James Hamilton,
was Chubb Custom's corporate representative in the Copper River
case and Kurt Chapin, Ace's Chief Technology Officer, who took
no part in the handling of the Copper River claims, personally

knew about the holding in <u>Copper River</u>.  Hamilton was the direct manager to Mr. Magnotta, the executive general adjuster who took part in the cause of loss assessment in this case.  Hamilton Dep., ECF No. 151-11 at 25.  Hamilton testified that he was unaware of the decision in <u>Copper River</u> prior to preparing for his deposition in this case.  <u>Id.</u> at 14.  Chapin, who was not involved in the claims analysis in <u>Copper River</u>, did not share what he knew about the holding in that case with his staff because he understood it to be confined to the particulars of that policy, the facts of the case, and that jurisdiction, and thus, it would likely not have impacted other matters.  Chapin Dep. 15.

        The tenuous connection plaintiff draws between these two claims is not evidence of malice as defined in this setting by the Supreme Court of Appeals for West Virginia.  Plaintiff has presented no evidence that any of defendants' employees willfully, maliciously, or intentionally disregarded the holding in <u>Copper River</u>.  As discussed <u>supra</u>, <u>Copper River</u> is neither preclusive nor binding precedent to this case, and to the extent that the case may be argued as persuasive, it is confined to the particulars of the contract involved in that case, which is not the same as the plaintiff's contract, and it involves the application of another state's law.  Chapin's conclusion that

the holding in Copper River was inapplicable was reasonable and
falls well short of the malice standard.  Likewise, Hamilton's
lack of knowledge as to the holding of the Copper River decision
itself negates malice.

In addition, plaintiff tosses in a list of alleged
misconduct by defendants in the course of litigation, including
hiding their involvement in Copper River during discovery, false
statements made by defendants in their summary judgment briefing
which have been discussed supra, and "other misconduct," as
evidence of defendants' malice.  Plaintiff cites no case for the
proposition that litigation misconduct may constitute
maliciousness in the settlement process, which is definitionally
over by the time that litigation in this case commenced.
Moreover, plaintiff cites no evidence that any alleged
misconduct by defense counsel was committed intentionally,
willfully, or maliciously.

Plaintiff has shown no evidence that defendants
engaged in a business practice, policy, or custom of any unfair
trade practices in relation to settlement of this case or any
other.  Nor has plaintiff shown evidence that defendants acted
with malice in the settlement of plaintiff's claim.
Accordingly, summary judgment against plaintiff is granted as to
Count IV and as to an award of punitive damages.

## IV. Conclusion

Accordingly, it is hereby ORDERED as follows:

1. Plaintiff's motion to supplement its summary judgment briefing is granted;

2. Plaintiff's motion for summary judgment is denied as to Counts I-IV of the amended complaint and as to defendants' First, Third, and Fifth through Fifteenth Affirmative Defense;

3. Defendants' First, Seventh, Eighth, Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth defenses are stricken;

4. Plaintiff's motion for summary judgment is granted as to defendants' Second and Fourth Affirmative Defense;

5. Defendants' motion for summary judgment is denied as to Counts I-III;

6. Defendants motion for summary judgment is granted as to damages relating to the replacement of Silo 1, Count IV of the amended complaint, and as to punitive damages, and denied as to other damages.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER: June 23, 2021

John T. Copenhaver, Jr.
Senior United States District Judge